HANOVER FIRE INSURANCE COMPANY, Plaintiff, *v.* MORSE DRY DOCK AND REPAIR COMPANY, Defendant.

GLOBE AND RUTGERS FIRE INSURANCE COMPANY, Plaintiff, *v.* MORSE DRY DOCK AND REPAIR COMPANY, Defendant.

UNIVERSAL INSURANCE COMPANY, Plaintiff, *v.* MORSE DRY DOCK AND REPAIR COMPANY, Defendant.

EAGLE STAR AND BRITISH DOMINION INSURANCE COMPANY, Plaintiff, *v.* MORSE DRY DOCK AND REPAIR COMPANY, Defendant.

Supreme Court, New York County, June 28, 1934.

*Single, Atkins & Tyler* [*Forrest E. Single* and *Wilmer H. Eberly* of counsel], for the plaintiffs.

*Palmer, Barber, Matters & Merritt* [*George S. Brengle, T. Catesby Jones, George W. Betts, Jr.,* and *John M. Aherne* of counsel], for the defendant.

COTILLO, J. These are four actions brought in equity for the rescission of four policies of insurance issued by the four plaintiff insurance companies and covering the legal liability of the defendant Morse Dry Dock and Repair Company as ship repairers. These cases were tried before the late Mr. Justice PHŒNIX INGRAHAM, but remained undecided at his death, and were retried before me pursuant to the stipulation upon all the pleadings, the stenographer's minutes of the trial, the briefs and reply briefs of the respective parties, and upon all the proceedings heretofore had, with the same force and effect as if originally and completely tried before me.

The policies in question are on a standard form of hull insurance known as the American Hull Underwriters' Association form, and aggregate the sum of $275,000, although at the outset the defendant sought to obtain $500,000 from American companies and intended to place a further $500,000 in London. There is no dispute that the firm of B. T. Nolan Co., Inc., of New York city, acted as agent and broker for the defendant in placing this insurance, which appears to have been treated by all parties as marine insurance. The practices prevailing in the placing of marine insurance were followed in placing the present policies. The insurance broker, in accordance with the prevailing custom as broker for the defendant, called upon the plaintiff companies and submitted a form of provisional binder previously prepared by his office and the office of the attorney for the defendant who was at that time an officer of the brokerage firm and receiving a portion of its profits. These provisional binders were placed before the plaintiff companies for their examination, correction and approval some time between June 9, 1924, and July 2, 1924. On June 24, 1924, while the steamship *Egremont Castle* was lying in Atlantic Dock, Brooklyn, being loaded with oil and at the same time having repairs made by the

defendant, an explosion occurred. The explosion was evidently caused by employees of the defendant who were using an acetylene torch in the after peak tank, and ignited fumes which had collected in the tunnel and the shaft alley of the ship from leaking cases of naphtha. This catastrophe resulted in numerous suits being started for damages. This accident concededly occurred during the time that the provisional binders were lying awaiting acceptance. The plaintiffs claim that while the application for insurance was made by the defendant, the defendant and its agent, the broker, had full knowledge of the occurrence of this accident and losses on the 24th day of June, 1924, and that none of the plaintiffs or their agents, either on the 23d day of July, 1924, when the binder for insurance was issued, or on the 24th day of July, 1924, when the policy of insurance was issued, had any knowledge of the accident to the steamship *Egremont Castle* and the said cargo losses, and of the fact that the vessel was then being repaired by the defendant. They also claim that the defendant and its agent were, in good faith, under a duty at the time of applying for and receiving the said insurance, to inform the plaintiffs of the accident which had occurred on the 24th day of June, 1924, but, instead and in violation of the said duty, the defendant and its broker as its agent, with the intent to defraud the plaintiffs, concealed from them and their agents the occurrence of the accident and made no mention thereof, and requested the insurance to commence from the 15th day of June, 1924, so as to cause the insurance to cover the damage to the steamship *Egremont Castle* and the loss of and damage to the cargo of said vessel. Knowledge on the part of the plaintiffs of said loss was material to the risk.

The plaintiff in the course of its business was entitled to rely upon the defendant and its broker acting as its agent in applying for the insurance to make known the fact of the said accident and any and all other facts material to the risk in view of the fact that it was the intention of the parties at the time the application for insurance was made to cover the legal liability of the defendant Morse Dry Dock and Repair Company for the period from June 15, 1924, to June 15, 1925, against any and all losses and accidents which might have occurred between said dates, provided that such losses or accidents, if any, were unknown to both the plaintiff and the broker, its agent, and it was not the intention of the plaintiffs at the time the binder for the insurance was issued to insure the defendant against a loss which had already occurred and was known to the defendant and unknown to the plaintiffs. If this loss had been known to the plaintiffs the policy of insurance would have excluded the loss to the *Egremont Castle*.

The defendant made no claim for this loss until September 24, 1932. The defendant admits the accident to the steamship *Egremont Castle* on the 24th day of June, 1924, while the same was undergoing repairs or alterations and was in the care, custody and control of the defendant, and that the accident resulted in loss and damage to the said vessel and cargo aboard the vessel, but claims that the policy of insurance was issued under and pursuant to an application and binder for said insurance which was made, signed and delivered by the plaintiffs herein on the 9th day of June, 1924, and further raises in defense that the plaintiffs had knowledge of the accident and the loss thereunder on the 24th day of April, 1925, and other dates between that date and the 30th day of September, 1932, and that the action cannot be maintained because of laches. It also raises the defense of the Statute of Limitations as the accident did not occur within six years before the commencement of this action.

Nolan testified that in accordance with custom, he, as broker for the defendant, called upon the plaintiff companies and submitted a form of provisional binder previously prepared by his office and the office of the attorney for the defendant who was at that time an officer of the Nolan Company and was receiving a portion of its profits. These provisional binders were placed before the plaintiff companies for their examination, correction and approval some time between June 9, 1924, and July 2, 1924, and the records of Talbot, Bird & Co., Inc., who represent the Universal and Eagle Star Companies show this to be a fact as testified to by one of the employees of this company whose duty it was to record the receipt of such applications or provisional binders. The witness Nolan admitted that he was in error when he previously swore on the stand that he personally took the provisional binders to the respective plaintiffs. The conclusion is inescapable that Nolan's story that the provisional binders were signed by the various plaintiffs on June 9, 1924, is incredible in the face of the testimony of trusted employees of the various companies, some of whom are no longer employed by any of the plaintiffs. This testimony in many instances is borne out and corroborated by documentary proof or by records regularly made in the ordinary course of business conducted by the various plaintiffs. Nolan, in three signed statements, contradicted completely his testimony on the witness stand. At the trial he sought to minimize the effect of the affidavits by claiming that he was intoxicated when he signed them. I am unable to understand how the evidence offered on this point, even if accepted, can make true the version told by Nolan at the trial. At best his testimony

and that of his mother-in-law and intimate companions indicate that he was imbibing rather freely of intoxicating beverages. There is not a scintilla of evidence that the plaintiffs or any of them were inducing him, encouraging or enticing him to so imbibe, nor is there any suggestion that they knew of his libations. The proof falls far short of showing that he did not know what was in the statements or that he did not know what he was signing. Should we go so far as to concede that he was intoxicated at the time he signed the affidavits, and at least one of them appears to have been in his possession for several days before he signed it, this fact would not render true the contradictory version to which Nolan swore on the stand. The dependable evidence in the case makes it impossible to escape the conclusion that Nolan is in error when he states that he presented the provisional binders on June 9, 1924, and that on the same or the following day the plaintiff companies accepted them and that they then became the final binders in which all the necessary terms and essential parts of the agreements were consented to.

The delivery of the provisional binders or applications to the insurance companies did not constitute a valid contract of insurance since essential elements had yet to be supplied, such as the date when it was to attach, the term or duration and the risk insured against. (*Bradley* v. *Standard Life & Accident Ins. Co.*, 112 App. Div. 536; *Morris & Cummings Dredging Co.* v. *Firemen's Fund Ins. Co.*, [S. D. N. Y.] 36 F. [2d] 276; *Arnold* v. *Rothschild's Sons Co.*, 37 App. Div. 564; affd., 164 N. Y. 562; *Ansorge* v. *Kane*, 244 id. 395.) The provisional application was received by the plaintiff Hanover Fire Insurance Company about June 9, 1924, but changes were made in the proposed form and it appears that the policy was not agreed upon until about July 23, 1924, nearly a month after the loss occurred on the steamship *Egremont Castle*. The evidence shows that in the case of the Globe and Rutgers policy the insurance was not finally bound until some time between June 28 and July 28, 1924, which was between twenty days and a month after the explosion of the insured vessel.

As to the policies written by the Universal and Eagle Star Companies, it is conceded by the defendants that the provisional application was received by the agent for the two companies on July 2, 1924, almost ten days after the explosion and at nearly a week after the defendant admittedly knew of the accident. Neither the defendant nor its representatives Nolan and Palmer make any pretense that they notified the plaintiff companies of the explosion. Defendant relies on the case of *Pendergast* v. *Globe & Rutgers Fire Insurance Co.* (246 N. Y. 396). That case was decided on

entirely different facts. There the insured had reason to believe in good faith that the insurance had been finally placed. Here the defendant and its representatives knew that it had not been placed.

In the present case we have conclusive evidence of fraud in that the defendant did not disclose to the plaintiffs prior to the final closing of the insurance that a loss had already occurred. Such fraud or failure to disclose the true facts is sufficient grounds for a court of equity to decree a cancellation or rescission of the policies in question. In *Cox* v. *Blake Co.* (100 Misc. 135) the question was whether the contract of insurance could be avoided in an action brought, as here, to annul or reform a certificate of marine insurance because of the mistaken belief on the part of the insurers. The opinion of Mr. Justice GREENBAUM is as follows: " ' Contracts of marine insurance are *uberrimæ fidei,* and there is an obligation to voluntarily disclose all facts and circumstances which are material to the risk and not within the knowledge of both parties.' (26 Cyc. 617.)"

Quoting from Arnould on Marine Insurance (10th ed.), section 575, the rule is laid down as follows: " Whether such suppression of the truth arise from fraud (that is, from a wilful intention to deceive for the party's own benefit), or merely from mistake, negligence or accident, the consequences will be the same. * * * The ground, in short, on which the policy is avoided is that the party has been, in fact, deceived."

Mr. Justice GREENBAUM continues: " It has been expressly held that if the knowledge of the facts that were suppressed would have induced the insurer to demand a higher premium or to refuse altogether to underwrite it would be sufficient to invalidate the policy. [Citing *Murgatroyd* v. *Crawford,* 3 Dall. 491; *Kerr* v. *Union Marine Ins. Co.,* 130 Fed. 415; *Carrollton* v. *American C. Indemnity Co.,* 124 id. 25.] "

The duty of communication, indeed, is independent of intention, and is violated by the fact of concealment even where there is no design to deceive. (*Sun Mutual Ins. Co.* v. *Ocean Ins. Co.,* 107 U. S. 485, 510.) If, knowing that his agent is about to procure insurance the insured withholds information of a loss and procures the insurance without disclosing such information, it is a manifest fraud which avoids the policy. (*McLanahan* v. *Universal Ins. Co.,* 1 Pet. [U. S.] 170, 185.) In equity a rescission of a contract may be adjudged on the ground of unilateral mistake and a reformation will be decreed where there is excusable mistake of one party and fraud of the other. (*Metzger* v. *Ætna Ins. Co.,* 227 N. Y. 411.) Courts of equity have never refused jurisdiction when the whole

merits of the case were before them, and relegated the parties to an action at law. (*Bidwell & Banta* v. *Astor Mutual Ins. Co.*, 16 N. Y. 263.)

An action may be maintained in equity to rescind a transaction which has been consummated through a misrepresentation of material facts not amounting to fraud. (*Bloomquist* v. *Farson*, 222 N. Y. 375, 380.) The power of a court of equity to compel the cancellation of written instruments procured through fraud is stated in the case of *McHenry* v. *Hazard* (45 N. Y. 580): "The power of a court of equity to compel the surrender and cancellation of deeds and other written instruments, obtained by fraud or held for inequitable and unconscientious purposes, is undoubted. The jurisdiction is an ancient one, and is grounded upon the inherent power of the court to take cognizance of frauds and to administer the peculiar remedies which belong to a court of equity in preventing and suppressing them. * * * It has been frequently exercised by compelling the surrender and cancellation of bonds, policies of insurance * * *."

Plaintiffs have no remedy at law which is "plain and adequate and as certain, prompt, complete and efficient to attain the ends of justice and its prompt administration as the remedy in equity." (*Dailey* v. *City of New York*, 170 App. Div. 267; affd., 218 N. Y. 665.) The theory that the rule that adequacy of remedy at law is a constant limit upon the exercise of equity jurisdiction has been less generally adopted than the theory that the rule is to be taken in a generic sense as indicating the origin of the jurisdiction and defining generally its grounds and subjects. (*Lang's Creamery, Inc.*, v. *City of Niagara Falls*, 224 App. Div. 483, 485; affd., 251 N. Y. 343.) A court of equity will not refuse to take jurisdiction of a case merely on the ground that the complainant has a perfect remedy at law, if the parties have submitted themselves to the jurisdiction of equity without objection. (*Bank of Utica* v. *City of Utica*, 4 Paige, 399.) It is true that in the present case the defendant amended its answer to include the formal statement of such a defense, but to compel the plaintiffs to await the outcome of suits for damages upon the policies in question and to relegate them to the position of defendants in such actions is not giving them a "plain and adequate" remedy, "as certain, prompt, complete and efficient" as the remedy afforded here. The policies sought to be canceled were obtained through the failure to disclose the very material fact of a serious loss, damages from which apparently greatly exceed the amount of these policies. All the facts are before this court in equitable action. Certainly the defendant cannot, in equity, be permitted to compel the plaintiffs

to await the trial of actions for damages upon the policies. The attempt to show laches must fail as the plaintiffs were not compelled to bring these actions until claims were made by the defendant under the policies.

Although the plaintiffs may have known at some date after the policies were issued that an explosion occurred on the steamship *Egremont Castle*, and may have been informed that the defendant was sued for damages as a result thereof, they were at the same time told by the defendant that the latter was in no way responsible for the accident. That judgments against the defendant were obtained in the damage actions of which plaintiffs knew did not change the situation. The plaintiffs first discovered the true facts after the defendant made a claim under these policies.

The proposed findings of fact and conclusions of law have been passed on as indicated in the margin thereof. Submit on notice proposed decision containing all findings and conclusions approved by me, together with final judgment.