(170 App. Div. 267)

DAILEY et al. v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. December 10, 1915.)

1. MUNICIPAL CORPORATIONS ☞673—CONTRACTS—DUMPING.

Where plaintiffs had contracted in 1908 for the disposal of city street rubbish, which contract permitted sea dumping only at the direction of the commissioner of street cleaning, and the contract which plaintiffs made with the city in 1913 for the same work provided that it should at all times be subject to the commissioner's supervision, inspection, and approval, that his interpretation of the contract should be final in case of doubt, ambiguity, or obscurity as to its meaning, and that he might give all directions and explanations required to make the provisions of the contract clear and effective, making no mention of sea dumping, such contract of 1913 authorized plaintiffs to dump at sea at will, and the commissioner's action in attempting to prevent them from so doing, by notification or order not to do so, was unsanctioned by the contract.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1454; Dec. Dig. ☞673.]

2. INJUNCTION ☞11—RESTRAINING BREACH OF CONTRACT—ILLEGAL OFFICIAL ACTION—CONDITIONS PRECEDENT.

Where the commissioner of street cleaning of defendant city, being unauthorized by the city's contract with plaintiffs, contractors for the removal of street rubbish, to prohibit sea dumping, directed the superintendent of final disposition to prevent sea dumping, plaintiffs' action to enjoin the violation of the city's contract with them was not prematurely brought because the superintendent of final disposition had not threatened to effectuate the commissioner's direction, which it was his duty to obey, since, where a public officer has been commanded to do an illegal act by a superior, the fact that he has not threatened to do it is no bar to the maintenance of an action to restrain its commission.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. ☞11.]

3. INJUNCTION ☞59—BREACH OF CONTRACT—REMEDY AT LAW.

Where plaintiffs, contractors for the disposition of street rubbish, had given bond for $200,000 to secure performance of their contract, and de-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

posited $40,000 in cash, which was to be returned to them, part upon partial and part upon complete performance, the city also deducting 10 per cent. from each month's payment, to be retained until the end of the year, the contract in addition imposing severe penalties for delay or default in performance, when the commissioner of street cleaning directed that no more sea dumping be permitted, which, under their contract, the plaintiffs had the right to do, they were entitled to equitable relief to restrain such illegal prevention of the means of disposing of the rubbish, since any refusal on plaintiffs' part to comply with the direction would have subjected them to expensive litigation and an action at law for the recovery of damages difficult to estimate, while the remedy at law, to exclude equitable relief, must be as plain, adequate, certain, prompt, complete, and efficient as the remedy in equity.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 114–116, 128; Dec. Dig. ☜59.]

4. MUNICIPAL CORPORATIONS ☜673—DUMPING CONTRACT—BREACH—DAMAGES.

Where defendant city broke its contract with plaintiff contractors for the removal of street rubbish, their measure of damages at law was the profit which they would have earned from the performance of the contract.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1454; Dec. Dig. ☜673.]

Appeal from Special Term, New York County.

Action by John D. Dailey and another against the City of New York and another. Judgment for plaintiffs, and defendants appeal. Affirmed.

For opinion below, see 149 N. Y. Supp. 109.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

E. Crosby Kindleberger, of New York City, for appellants.
Nathan L. Miller, of Syracuse, for respondents.

McLAUGHLIN, J. This action was brought to obtain an injunction restraining the defendants from interfering with the plaintiffs' performance of a contract with the city of New York for the disposal of ashes, street sweepings, and rubbish in the boroughs of Manhattan and the Bronx. In performing the contract the plaintiffs made use of so-called dumping scows when the rubbish was dumped at sea. On March 25, 1914, they were notified by the superintendent of final disposition, acting under orders from the commissioner of the department of street cleaning, that on and after April 1, 1914, the city would not permit the plaintiffs to use sea dumpers. They thereupon brought this action to restrain the defendants, during the term of the contract, from refusing to deliver the ashes, street sweepings, and rubbish to the plaintiffs upon these dumpers. From a judgment granting such relief, the defendants appeal.

[1] The contract in question was entered into on the 12th of August, 1913, and provided for the final disposition of what may, for brevity, be called "street rubbish," for a period of three years, commencing January 2, 1914, and at the expiration of that time with the right to the city to renew for an additional two years upon the same terms.

The street rubbish was to be delivered at certain specified piers on the water front in the borough of Manhattan, where it was dumped from carts upon scows operated by the contractors. The contract provided that the contractors should have the privilege of picking over the street rubbish gathered in the borough of the Bronx and reclaiming the valuable materials found therein, on paying therefor $12,000 per year, such amount to be paid to the city by its deducting $1,000 per month from the amount otherwise to be paid to the contractors, and that "this privilege in the borough of Manhattan is reserved by the city to be let to another contractor, who will perform the work of trimming the scows, and who shall have at all times free access to the scows while loading operations are being carried on." On the same day the city entered into another contract, subsequently assigned to the Clarke Contracting Company, "for loading and trimming deck scows, dumpers, and other vessels used for the receipt and transportation" of the street rubbish at the water front dumps in the borough of Manhattan for a similar period, in consideration of which the contractor was given the picking privilege and agreed to pay the city upwards of $1,400 a week during the life of the contract.

The plaintiffs had been engaged in the disposal of the city's street rubbish since some time prior to 1881. It was generally used for land fills at various points near the city, and the contract under which the plaintiffs had been operating just previous to the one in question required not less than 50 per cent. nor more than 60 per cent. of the street rubbish to be deposited at Riker's Island, and provided that dumping at sea should be done only at the direction of the commissioner of street cleaning at special prices. Under the contract in question not less than 20 per cent. nor more than 30 per cent. was to be deposited at Riker's Island, and there was no clause in it which prohibited sea dumping, nor any other restriction as to the disposition of the street rubbish, except that the contractors had to comply with the laws of the state and the United States, with the Sanitary Code, and the ordinances and regulations of the board of health of the city.

The amount of the street rubbish to be disposed of, as may easily be conceived, considering the population of the boroughs of Manhattan and the Bronx, was enormous and constantly increasing, and during the first three months of the contract under consideration plaintiffs dumped from one-fourth to one-third of the rubbish at sea. The dumpers used for this purpose were so constructed that the sides or bottom could be opened, allowing their contents to slide into the sea. They could thus be loaded or emptied more expeditiously and carry larger loads than the deck scows used for land fills. But in closing the sides and bottoms a certain amount of water remained in the dumpers, so that, when they were being loaded, a considerable quantity of the street rubbish was dumped into the water in the bottom of the dumpers and could not be picked over.

On March 24, 1914, the defendant commissioner wrote the plaintiffs, stating that under the two contracts, which must be read together, the Clarke Contracting Company was entitled to have free access to

the vessels used; that plaintiffs' contract did not permit the use of vessels not affording free access; that, under the contract, the use of sea dumpers could be limited to cases of emergency, and, while their use had been permitted, it must be understood that this was only because of the emergency due to the winter season. The letter also dealt with other subjects relating to the performance of the contract, unnecessary to be considered, since the same are not involved. Upon receipt of this letter plaintiffs at once protested vigorously against any attempt on the part of the city to interfere with their right to dump the street rubbish at sea, in the sea dumpers then used. But notwithstanding such protest, on the following day they received a notice, or order, to which reference has already been made, purporting to set forth regulations for the performance of the contract, and stating that the use of sea dumpers in the future would be permitted only in cases of emergency, upon the written consent of the department of street cleaning, and that "on and after April 1, 1914, the use of sea dumpers will not be permitted."

That the city had no right to impose such regulation is, I think, clear beyond question. The contract provided that the work should, at all times, be accessible to the commissioner and subject to his supervision, inspection, and approval. He was empowered to direct the contractors to increase the efficiency or improve the character of the appliances, processes, devices, or methods used by them. It also provided that his interpretation of the contract should be final in case of doubt, ambiguity, or obscurity as to its meaning or wording, and that he might give all such directions and explanations as might be required to make the provisions of the contract clear and effective. But it is perfectly obvious that none of these provisions gave him any right to prohibit sea dumping or to forbid the use of sea dumpers. Under the terms of the contract the disposition of the street rubbish, other than the amount required to be deposited at Riker's Island, was left entirely to the contractors and the city was not concerned with it after it had been delivered to the contractors at the dumps or piers. The contract did not specify or attempt to limit the kind of vessels in which the street rubbish was to be taken away. They are variously referred to as "transporting conveyances," "vehicles," and "scows"; a considerable number of deck scows belonging to the city being placed at the disposal of the contractors. The use of dumping scows or sea dumpers was, and for a long time had been, the recognized method of doing the work, and the complaint against them is, not that they were inappropriate or inefficient, but rather that they were too efficient. The requirement that the picking contractor should "have free access to the scows while loading operations are being carried on" did not, of course, limit the right of the plaintiffs to use such type of vessel as they saw fit. Moreover, it appears that the picking contract referred specifically to "dumpers," as these sea dumpers were usually called.

If the question of this construction of the contract were a doubtful one, all doubt is removed by a consideration of the circumstances surrounding its execution. The plaintiffs then had a contract with the

city, made in 1908, requiring them to deposit between 50 and 60 per cent. of the street rubbish at Riker's Island and permitting sea dumping only at the direction of the commissioner. Payment was made on the basis of scow loads, special prices being allowed for sea dumping. Under the present contract the contractors could deposit not more than 30 per cent. of the rubbish at Riker's Island, payment being made on the basis of cartloads delivered at the dumps, and nothing whatever being said about sea dumping. This omission in the present contract is very significant. The difference between the two contracts shows conclusively, as it seems to me, that in the one under consideration, if it were not actually contemplated that the contractors might resort to sea dumping to a considerable extent, at least there was no intention to restrict their right to do so. The same type of sea dumpers had been used for the sea dumping done under the preceding contract. No claim is made that the plaintiffs had refused to allow the Clarke Contracting Company free access to the dumpers, so far as the construction of the dumpers permitted, while loading operations were going on. Nor is any claim made that the contractors had not complied with all the city, state, and federal statutes and regulations of the board of health in reference to dumping at sea. The attempt to prove that the beaches near the city suffered by such dumping was not sustained by the evidence. Such claim did not come within the issues involved, and the evidence relating thereto was entirely irrelevant to the determination of the present controversy. The action of the commissioner was not based, and could not have been justified, upon that ground.

[2] The right of the plaintiffs, therefore, to dump a portion of the street rubbish at sea by means of these dumpers, cannot, when the contract is fairly construed, be open to dispute. The action of the commissioner in attempting to prevent the plaintiffs from so doing by the notice or order in question was not sanctioned by the terms of the contract and was entirely unauthorized. But it is urged that the action is prematurely brought, because the superintendent of final disposition had not threatened to carry into effect the direction of the commissioner. It was his duty to carry into effect the direction of a superior. The rule is well settled in this state at least that where a public officer, by the order or direction of a superior authority, the regularity of which it is not his business to investigate, and which it is his official duty to obey, has been commanded to do an illegal act, the fact that he has not threatened to do such act is no bar to the maintenance of an action restraining its commission. Williams v. Boynton, 147 N. Y. 427, 42 N. E. 184. Having been made, the legal presumption is that it would be carried into effect, and the plaintiffs were not bound to wait until that had actually been done before applying to the court for relief.

[3, 4] Upon the merits, therefore, the judgment is right, and should be affirmed, and the only substantial reason urged for reversing it is that the plaintiffs were not entitled to maintain the action, since they had an adequate remedy at law. If the order had actually been carried out, I do not think it can fairly be said that the plaintiffs would

have had an adequate remedy at law. Under the contract they had been required to give as security for its performance a bond for $200,-000, and to deposit $40,000 in cash, of which $30,000 was to be returned to them at the end of the first year and the balance at the termination of the contract. The city also deducted 10 per cent. from each month's payment, to be retained until the end of the year. In addition to this, the contract imposed very severe penalties upon the plaintiffs for any delay or default in performance. If, therefore, the plaintiffs had refused to comply with the direction on the ground that the contract had been broken by the city, and abandoned its performance, the city would undoubtedly have attempted to enforce all the available penalties against them. Not only would they have been subjected to expensive litigation, but the damages which they would have been entitled to recover for the city's breach of the contract would not have been capable of any accurate determination. The measure of damages, of course, would have been the profits which the plaintiffs would have earned from the performance of the contract, and the impossibility of estimating such profits with any degree of accuracy is apparent. The cost of the work now being done could only be determined after a long accounting, and the amount of work which would have been done under the contract is entirely speculative. The contract expressly provided that the city should be under no obligation to deliver to the contractors any specific amount of rubbish. The amount collected by the city varies and is constantly increasing. Not only this, but the term of the contract is uncertain, because the city has the option of extending it for two years.

In order to deny one the relief which a court of equity can give, it is not in all cases sufficient that there be a remedy at law. The remedy must be plain and adequate, and as certain, prompt, complete, and efficient to attain the ends of justice and its prompt administration as the remedy in equity. Texas Co. v. Central Fuel Oil Co., 194 Fed. 1, 114 C. C. A. 21, and cases cited; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, 36 L. Ed. 82; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594, 32 L. Ed. 1005; Erie Railroad Co. v. City of Buffalo, 180 N. Y. 192, 73 N. E. 26. In the Walla Walla Water Co. Case the city had contracted with the water company for a supply of water for a term of years, agreeing that during the existence of the contract it would not erect or maintain any water system of its own. It subsequently authorized an issue of bonds for the purpose of constructing such a system, and the water company thereupon obtained an injunction enjoining it from issuing the bonds. It was there urged that, since the contract provided that the city might at any time acquire the plant of the company by condemnation, the water company could sue to recover the value of its plant and thus it had an adequate remedy at law. But the Supreme Court pointed out that the water company, notwithstanding the action of the city in putting in a system of its own, might elect to continue its business, in which event its damage would be very uncertain, and affirmed the decree enjoining the city from proceeding. Mr. Justice Brown, in the opinion delivered, said:

156 N.Y.S.—9

"This court has repeatedly declared in affirmance of the generally accepted proposition that the remedy at law, in order to exclude a concurrent remedy at equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administration, as the remedy in equity [citing cases]. Where irreparable injury is threatened, or the damage be of such a nature that it cannot be adequately compensated by an action at law, or is such, as from its continuance, to occasion a constantly recurring grievance, the party is not ousted of his remedy by injunction. In such a case as this the remedy will save to one party or the other a large pecuniary loss—to the city, if it be obliged to pay the plaintiff damages occasioned by the establishment of its competing works; to the plaintiff, if it be adjudged that the city has a right to do so."

In Erie Railroad Company v. City of Buffalo, supra, the railroad company had entered into a contract with the grade crossing commissioners, binding upon the city, which provided for the erection of certain structures at their joint expense, and further providing that a certain viaduct on Perry street should not be erected until the work on other streets had been finished and until two-thirds of the commissioners should determine its construction to be necessary. The court held that the railroad company was entitled to enjoin the construction of the viaduct until these conditions had been complied with. In answer to the argument that the plaintiff had an adequate remedy at law, by simply refusing to pay its share of the costs, or by claiming damages, Werner, J., who wrote for a majority of the court, said:

"While all this may be possible, it is by no means clear. Who can tell in what particular manner and at what precise cost the work will be done, if it is deferred until the other work is finished and two-thirds of the commissioners then determine that it shall be done? Who can now say what bonds will sell for and what work will cost when that time comes? * * * It is more than probable that if the plaintiff had simply rested on its supposed legal rights, and had relied upon its defense to an action for the recovery of its proportion of the cost of the Perry street viaduct, it would have been met with the embarrassing suggestion that it had looked on and permitted the work to progress without objection, and was therefore estopped from claiming that it was not liable. But, even if no such question could have arisen, there would still have remained the difficulty, and perhaps the impossibility, of proving its damages. * * * The real question in such cases as this is not whether a party is utterly without remedy at law, but whether the legal remedy, if any, is inadequate in the sense that it will not place the parties to the contract in the same positions which they occupied before the attempted breach of the contract."

The reasons set forth in the authorities cited for sustaining an injunction are applicable to this case. It seems to me clear, if the plaintiffs had abandoned the contract upon its breach by the city, their remedy at law would have been entirely inadequate. The damages sustained would necessarily have to be ascertained on a basis so uncertain as not to afford them an adequate redress, or place them in the same position which they occupied at the time of the breach. But it is suggested that the plaintiffs should have complied with the direction of the commissioner, and in that event they would have been in a position to recover from the city the damages sustained in being compelled to do the work entirely at land fills by means of deck scows. There are two answers to the suggestion: (a) The plaintiffs were under no obligation to continue the work upon such conditions; and (b) if they

had done so, it is by no means clear they could have recovered any damages from the city. The damages actually sustained by the plaintiffs would undoubtedly have been large, because, under the contract, they would have been obliged, within less than six days, to alter all the arrangements which had theretofore been made, and in that time provide new facilities for disposing of a considerable portion of the street rubbish. This could only be done at great expense, which the city would have to pay if it should subsequently be determined that the action of the commissioner were unauthorized. Under such circumstances, it is difficult to understand why, before either party has sustained damage, the city, if acting in good faith, should seek to avoid a determination of the present action upon the merits by insisting upon the technical defense of an adequate remedy at law. In Borough Const. Co. v. City of New York, 200 N. Y. 149, 93 N. E. 480, 140 Am. St. Rep. 633, the court has laid down, as a general rule, that:

"Where the municipal representative, without collusion and against the contractor's opposition, requires the latter to do something as covered by his contract, * * * and the question whether the thing is embraced within the contract is fairly debatable, and its determination surrounded by doubt, the contractor may comply with the demand under protest and subsequently recover damages, * * * even if it turns out that he was right and that the thing was not covered by his contract; and, on the other hand, if the thing required is clearly beyond the limits of the contract, the contractor may not even under protest do it and subsequently recover damages."

In the present case the commissioner's attempt to prevent sea dumping was, as already indicated, unauthorized under the contract. Not only this, but the case differs from any of those to which our attention has been called, in that the plaintiffs were not directed to do additional work not covered by the contract, but were merely forbidden to do the work in a particular way. The contract provided that the prices fixed should be the sole compensation for the work to be performed, which was the removal of the street rubbish from the dumps. The plaintiffs were already doing at least two-thirds of the work with deck scows at land fills, and if they had, even under protest, discontinued sea dumping, I think it very doubtful whether they could have recovered anything beyond the contract price of the work done. As was said by Judge Werner in Erie Railroad Co. v. City of Buffalo, supra, their legal remedy is by no means clear, and it is more than probable that any suit for damages against the city would have been met by the embarrassing suggestion that, having continued to do the work, they had waived any claim that the contract had been breached. Even if their right to maintain such an action were clear, it would still, as already suggested, be practically impossible to determine with any degree of accuracy the damages sustained.

It seems to me, therefore, that the plaintiffs did not have a clear and adequate remedy at law for the injuries with which they were threatened, and for that reason they were entitled to invoke the aid of a court of equity. As the Supreme Court said in the Walla Walla Case, the action of the commissioner would have caused them damage occasioning a constantly recurring grievance, for which they could

not have been adequately compensated by an action at law. The Supreme Court of this state has general jurisdiction, both at law and in equity, and I can see no good reason, where the court has jurisdiction of the subject-matter, the issues are properly framed, and all of the parties are before the court, why it should not exercise its powers to prevent a wrong before it has been committed, as well as to award compensation after the wrong has been done. The tendency of courts at the present time is to look more at the substance than the form of the action. We are fast passing the time when a litigant is to be turned out of court because he has entered at the wrong door, or asked too little, too much, or the wrong relief in his complaint. It is for this reason that relief by injunction is now, more than formerly, asked and granted. This was pointed out in Green Island Ice Co. v. Norton, 105 App. Div. 331, 86 N. Y. Supp. 613, 94 N. Y. Supp. 1147, affirmed 189 N. Y. 529, 82 N. E. 1126, by Mr. Justice Herrick. He said:

"From time immemorial it has been the rule not to issue an injunction where the party praying for it had an adequate remedy at law; but our ideas of what are adequate remedies are changing, and it is gradually coming to be understood that a system of law which will not prevent the doing of a wrong, but only affords redress after the wrong is committed, is not a complete system, and is inadequate for the present needs of society, and that, where the rights.of the parties are clear, the court should interfere to prevent a violation of such rights—should prevent the doing of the wrong in the beginning, instead of allowing such rights to be violated and such wrongs to be done, and remitting the party injured to an action for damages as compensation for such wrongs and injuries, at best an uncertain remedy."

Many additional authorities might be cited, in which injunctive relief against the unauthorized and oppressive acts of public, or quasi public, bodies and officers, has been granted upon grounds far less convincing than appear in the case now before us. People v. Canal Board of N. Y., 55 N. Y. 390; Alpers v. City and County of San Francisco (C. C.) 32 Fed. 503; Los Angeles City Water Co. v. City of Los Angeles (C. C.) 88. Fed. 722; Castle Creek Water Co. v. City of Aspen, 146 Fed. 8, 76 C. C. A. 516, 8 Ann. Cas. 660; Turner's Falls Fire District v. Miller's Falls, 189 Mass. 263, 75 N. E. 630.

Alpers v. City and County of San Francisco, supra, in many respects resembles the present case. There the plaintiff had a contract with the city and county of San Francisco, giving him the exclusive privilege, for 20 years, of having and removing the carcasses of all dead animals not slain for food. The board of supervisors having taken steps to obtain bids from parties desirous of obtaining the carcasses of dogs killed by the poundkeeper, the plaintiff applied for an injunction restraining the municipality from passing any ordinance impairing the obligation of his contract, and restraining the poundkeeper from delivering the carcasses of animals to any other person. The injunction against the poundkeeper was granted; Field, C. J., saying:

"It is not pretended in this case that the plaintiff has failed in any respect to comply with his contract, and that the duty assumed by him has not been fully performed. The municipality cannot disregard its contract obligations upon mere caprice, or because a pecuniary advantage may be thereby secured.

When that is attempted, the courts will come to the relief of the contractor, if the party committing the injury is, with reference to the matter complained of, subject to their jurisdiction."

So, in the present case, it is not pretended that the plaintiffs have failed to comply with their contract, and the parties are before the court and subject to its jurisdiction. The contract involves a public work of great magnitude and necessity, which the interests of the public demand should be performed speedily and without interruption. The controversy involves simply a question of law as to the interpretation of a contract, which it is for the best interests of both the contractors and the city to have settled with as little delay and expense as possible. Under such circumstances it would indeed be unfortunate if a court of equity is powerless to act, or obliged to deny relief. I am thoroughly convinced that the authorities cited and the interests of justice require the court to hold that the plaintiffs are without any clear and adequate remedy at law, for which reason they are entitled to the equitable relief which the trial court has given them.

For the foregoing reasons, I am of the opinion that the judgment appealed from should be affirmed, with costs. The injunction contained in the judgment, it may be, is somewhat broader than the present controversy warrants, and for that reason the defendants should have leave to apply for its modification, should occasion therefor arise. The defendants' requests to find Nos. 33 to 37, both inclusive, which were found by the court below, are irrelevant and immaterial, and not sustained by the evidence adduced at the trial. They are therefore reversed. Settle order on notice.

CLARKE, SCOTT, and LAUGHLIN, JJ., concur. INGRAHAM, P. J., concurs in result.