**LEASCO CORPORATION, Plaintiff-Respondent,**

**v.**

**Peter T. TAUSSIG, Defendant-Appellant.**

**No. 921, Docket 72–1556.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 18, 1972.

Decided Dec. 12, 1972.

James E. Tolan, New York City (Judith S. Kaye, Joseph C. Kaplan, Olwine, Connelly, Chase, O'Donnell & Weyher, and Fuller, Lawton & Moyles, New York City, on the brief), for defendant-appellant.

Morton L. Ginsberg, New York City (Hoffberg, Margolies & Ginsberg, New York City, on the brief), for plaintiff-respondent.

Before MANSFIELD and TIMBERS, Circuit Judges, and GURFEIN, District Judge.*

* Of the United States District Court for the Southern District of New York, sitting by designation.

TIMBERS, Circuit Judge:

The essential questions presented on this appeal from a judgment for damages in amount of $669,000, entered in this diversity action in favor of plaintiff Leasco Corporation against defendant Peter T. Taussig, following a 4 day non-jury trial in the Southern District of New York, Harold L. Tyler, District Judge, are the propriety of the district court's rulings that defendant's claim of rescission based on mutual mistake and misrepresentation was without merit; that defendant had breached his agreement to purchase the stock of one of plaintiff's subsidiaries; and that, defendant having failed specifically to perform such agreement, plaintiff was entitled to damages. Finding no error, we affirm.

## I.

## BACKGROUND FACTS

Leasco Corporation (Leasco) is a Delaware corporation with its principal place of business in New York City. Prior to 1969, Leasco had acquired Louis Berger, Inc. (Berger, Inc.), a firm engaged on an international basis in civil engineering and consulting. Louis Berger Associates (Associates), a wholly owned subsidiary of Berger, Inc., also was acquired by Leasco and, together with Berger, Inc., constituted the "Berger division" of Leasco.

In July 1969, Leasco engaged appellant Peter T. Taussig as vice president and counsel to Berger, Inc. Taussig, a citizen of New Jersey, had civil engineering and law degrees and had practiced law—primarily concerned with construction contracts—in New York City for several years. Leasco hired him through the efforts of Frederick A. Jackson, vice president and corporate counsel for Leasco, who had become acquainted with Taussig when they were both associates in the early 1960's in a New York City law firm.

Shortly after joining Berger, Inc., Taussig became involved in the efforts of Berger, Inc. to acquire the assets of McCreary-Koretsky Engineers, Inc. (MKE), a California corporation engaged in civil engineering and consulting work. Leasco and Berger, Inc. were interested in acquiring MKE's assets in order to expand Leasco's "Berger division" and to make it more efficient. In late 1969 and early 1970, Taussig was asked to investigate MKE. He examined the service contracts held by MKE, as well as its balance sheets and income statements.

MKE at that time was facing bankruptcy because of income taxes due the federal government and a major lawsuit brought by one of its clients. A wholly owned subsidiary of Berger, Inc., McCreary-Koretsky International, Inc. (MKI), was able to acquire the contracts and personnel of MKE as part of a reorganization agreement. MKI had been incorporated specifically for the purpose of acquiring the assets of MKE. MKE was to be paid a percentage of the profits made by MKI on the acquired MKE contracts. The reorganization agreement was closed on September 16, 1970, effective as of April 1, 1970.

Taussig became a vice president of MKI. He acted as a liaison executive between MKI, the Berger companies, and Leasco. His task was to keep Leasco informed about MKI's activities, including its financial condition.

In early December 1970, Leasco began to consider divestiture of its entire Berger division. Leasco's management did not like the severe income fluctuations which are characteristic of the civil engineering and consulting business. They also believed that Leasco did not have enough experience effectively to run these businesses.

When Taussig learned that Leasco intended to divest itself of MKI, he offered to purchase it. In late December 1970, Jackson and Taussig discussed the possibility of a sale to Taussig. Taussig estimated that MKI's pre-tax earnings for the fiscal year ending Spetember 30,

1971 would be about $200,000. Jackson suggested that an appropriate sales price would be 10 times these projected pre-tax earnings, or $2,000,000. They then cut this amount in half, to $1,000,000, because, pursuant to the reorganization agreement with MKE, MKI was required to transfer approximately 50% of its profits to MKE. Taussig generally agreed to these price terms, but suggested a package of $625,000 cash combined with a release by Taussig of Leasco's guarantee of an outstanding loan of $375,000 to MKI from The Bank of America. Jackson agreed to these terms.

With the basic terms agreed upon, the parties began to draft a formal agreement. Taussig at the time was no longer formally employed by Berger, Inc. In April 1970, he had informed Mr. Louis Berger, chief executive of the Berger operations, that he would resign on November 2, 1970. His resignation was finally accepted in late December 1970, but he continued to work unofficially for Leasco. He moved into offices at Leasco in New York and worked closely with Jackson. He thus had access to the same financial data and other information concerning MKI as did the officers of Leasco.

On Feburary 26, 1971, an agreement was entered into for the sale of MKI to Taussig. The closing date was to be April 15, but later was changed by mutual consent to May 28. The price for MKI was $625,000, plus Taussig's release of Leasco from its guarantee to The Bank of America of its outstanding loan of $375,000 to MKI. Two days later, in order to increase the working capital of MKI, Taussig authorized an additional loan of $200,000 by The Bank of America to MKI, with a guarantee by Leasco. Later, another $25,000 was loaned by The Bank of America to MKI and guaranteed by Leasco.

On March 12, 1971, Taussig received the February financial statement for MKI. It disclosed a net loss of $4,702.

Taussig traveled to San Francisco where the headquarters of MKI were located. There he learned that a design error in the Fruitvale Bridge job, one of MKI's construction projects, had caused a substantial carryback loss which accounted for the income loss reflected in the February financial statement. This error also resulted in net losses for the months of March and April.

In April 1971, Taussig, in conversations with Jackson and others, indicated that he might not go through with the purchase. On May 28, a representative of Leasco attended the closing and tendered to Taussig the stock as required by the contract. Taussig refused to accept the tender or to perform as required under the contract.

On June 8, Leasco commenced this action seeking specific performance or damages. It claimed that Taussig had wrongfully refused to purchase all the shares of MKI. Taussig by way of defense claimed rescission of the agreement on the grounds of mutual mistake and misrepresentation with regard to material facts. On September 21, the district court denied Leasco's motion for summary judgment, but ordered discovery limited to the issue of the meaning of certain contract provisions and to the issue of mitigation of damages.

After a nonjury trial in January 1972, the district court filed an opinion on February 23, 1972 holding that there was no misrepresentation or mutual mistake and that Taussig had breached the agreement without factual or legal justification. The court ordered specific performance by Taussig at a reduced price of $169,000, together with a release by Taussig of Leasco from the $500,000 bank loan guarantee; or, if Taussig should fail to perform, a judgment for damages equal to the sales price plus the amount of the loan guarantee, for a total of $669,000. When Taussig failed to perform, a judgment in amount of $669,000 was entered against him.

## II.

### DEFENDANT'S CLAIM OF RESCISSION

It is undisputed that the contract between Leasco and Taussig was properly executed, and that Leasco made a proper tender of MKI stock on the closing date. Taussig contends here, as he did below, however, that the agreement should be rescinded because the contracting parties were mutually mistaken about a fact material to the agreement or because Leasco negligently misrepresented material facts. These allegedly mistaken or misrepresented facts relate to the projected and actual earnings of MKI.

### (A) Alleged Mutual Mistake

When Jackson and Taussig first discussed the sale to Taussig of MKI in late December 1970, Taussig estimated that the projected pre-tax earnings for MKI for fiscal year 1971 would be about $200,000. MKI's budget in fact showed $197,000 as the anticipated pre-tax earnings for MKI. When Taussig examined Leasco's management reports in January 1971, a graph representing MKI's financial condition showed the line for actual earnings through January approaching the line for anticipated earnings to that date. No doubt the $200,000 estimated earnings figure was one of several factors which determined the sales price of MKI. From these circumstances, Taussig argues that a basic assumption of both parties in negotiating the contract was that they were dealing with a company which would earn $200,000 in the fiscal year ending September 30, 1971. MKI in fact lost $12,000 during that fiscal year. Taussig contends therefore that the agreement should be rescinded because both parties were mistaken about this material fact.

The legal concept of "mistake" is similar to the legal concept of "misrepresentation" in that, under each, a party to a contract may be relieved from his obligations if he was unaware of certain material facts. "Mistake", however, is only such error as is made without representation or deception by the other party to the transaction. 13 Williston on Contracts § 1540 (3d Ed. 1970). Where the mistake is unilateral, the contract is not voidable. But where both parties assume a certain state of facts to exist, and contract on the faith of that assumption, they can be relieved from their obligations if the assumption is erroneous. See Baumann v. Florance, 267 App.Div. 113, 114, 44 N.Y.S.2d 706, 707 (3d Dept. 1943).

In the instant action, we hold that there was no mutual mistake. Both Taussig and Leasco may have hoped, but surely could not have been certain, that MKI would earn $200,000 in fiscal 1971. Neither party intended to allow rescission of the agreement if, as it turned out, one party got a better bargain than had been anticipated. The civil engineering and consulting business is personalized, highly technical, and extremely risky. Neither party could safely assume that the projected earnings would be realized. Both parties had equal access to information indicating that such a projection would be highly unreliable. Indeed, Taussig probably knew more about the business of MKI than anyone else at Leasco since he originally had investigated it, he served as its vice president and he was a liaison executive between Leasco and MKI.

The facts here are analogous to those in Backus v. MacLaury, 278 App.Div. 504, 106 N.Y.S.2d 401 (4th Dept. 1951). There the defendant sold a two week old bull calf to the plaintiff who planned to use it for breeding. The price paid, $5,000, was the usual price paid for a breeding bull. Both parties were aware that the earliest at which it can be determined whether a bull is fertile is approximately twelve months. Eighteen months after the sale the plaintiff discovered that the bull was sterile. He sued the defendant for damages. The court held that, since the parties had equal skill and knowledge on the subject of breeding bulls, a warranty of fitness for purpose could not be implied. 278

App.Div. at 506, 106 N.Y.S.2d at 403. With regard to the plaintiff's claim of mutual mistake, the court held determinative the fact that, on the day of sale, both parties were aware that the fertility of the bull was uncertain:

"Where the parties know that there is doubt in regard to a certain matter and contract on that assumption, the contract is not rendered voidable because one is disappointed in the hope that the facts accord with his wishes. The risk of the existence of the doubtful fact is then assumed as one of the elements of the bargain." 278 App. Div. at 507, 106 N.Y.S.2d at 404, quoting Restatement of Contracts § 502–f, at 964 (1934).

In the instant action, the parties cannot be said to have been without doubt that MKI's pre-tax earnings for fiscal 1971 would turn out to be $200,000. As we hold below, there was no warranty by Leasco that MKI actually would earn that amount. Taussig assumed "as one of the elements of the bargain" the risk that a considerably lesser amount would be realized.

We therefore agree with the district court that there was no mutual mistake of fact.

(B) *Alleged Misrepresentation*

Taussig also contends that MKI's financial statement for the month of January 1971 misrepresented MKI's financial condition. He claims that since this deceptive statement induced him to buy MKI he should be allowed to rescind the agreement.

MKI's January 1971 statement showed earnings of $49,000 for the fiscal year to date. In fact, however, one of the MKI projects had a serious design error that apparently was discovered by MKI project engineers in January but did not come to the attention of MKI's financial officer until February.[1]

The project on which the design error was made was the Fruitvale Bridge. The contract for this bridge was entered into in October 1970. By January 1971, it was determined that it was more than half completed. The accounting treatment for the project was the cost of completion method. Under that method, an accountant determines the revenues earned on the job to date by calculating the percentage of total estimated costs thus far incurred. MKI's financial officer calculated that by January 31 about 59% of the anticipated cost of constructing the bridge had been incurred. Accordingly, he determined that about 59% of the revenues from the project, or $77,000, should be credited to MKI's earnings. In January, however, MKI's chief project engineer discovered a design error in the bridge sufficiently serious to require that most of the bridge be reconstructed. As a result, MKI's profit and loss statement for February showed a loss of $4,702 primarily attributable to a "prior period adjustment" on the Fruitvale Bridge project. The statement showed a $13,290 reduction in revenue without a corresponding reduction of cost. The March and April statements also showed net losses primarily caused by the design error.

Taussig does not claim that Leasco deliberately failed to disclose the design error. Nor does he contend that those Leasco officers with whom he dealt knew about the design error at the time the contract was entered into. See Sheridan Drive-In, Inc. v. New York, 16 App.Div.2d 400, 405, 228 N.Y.S.2d 576, 582 (4th Dept. 1962). Nevertheless, MKI's January financial statement was misleading. Furthermore, MKI was negligent in failing to discover and to take account of the error. MKI's financial officer failed to check, as he normally did, with MKI's chief engineer before preparing the January statement.

1. In the Leasco organization, financial reports for subsidiaries are prepared by Leasco's controller who tries to get them in the hands of top management twelve business days after the end of the month.

It is not clear from the record when the January statement was released, but apparently it was late. It was issued, however, before Taussig entered into the contract with Leasco.

■ The question is who should bear a loss attributable to an error committed prior to the sale but not reported until after the sale. Under New York law, such a loss often is borne by the seller even if the misrepresentation is innocent. Gramby v. Carold Realty Co., 20 App.Div.2d 806, 808, 248 N.Y.S.2d 772, 774 (2d Dept. 1964). When a person has induced another to act by representations which are false in fact, although not dishonestly made, and damage has resulted directly from the action taken, the person making such representations often bears the loss. See E. & F. Construction Co. v. Town of Stamford, 114 Conn. 250, 158 A. 551 (1932); Hodgeson v. Brant, 156 Cal.App.2d 610, 319 P.2d 684 (1958). Before a court will grant rescission based on unilateral mistake, however, there must be a showing of equitable considerations which favor the party seeking rescission. Albany Discount Corp. v. Basile, 32 App.Div.2d 723, 300 N.Y.S.2d 464 (3d Dept. 1969). And the injured person can rescind only if the misstatement induced him to enter into the contract. Jones v. Title Guarantee & Trust Co., 277 N.Y. 415, 419, 14 N.E. 2d 459, 460 (1938).

■ In the instant case, the misleading MKI earnings statement did not induce Taussig to enter into the contract. Several facts lead us to this conclusion. Before entering into the agreement, Taussig was well aware that many of the MKI projects received cost of completion accounting treatment.[2] Thus he knew that the profit and loss statements were potentially misleading. He knew that the actual revenues might have been substantially higher or lower than those reported. Taussig also had access, not only to the books and records of MKI, but to its operating personnel as well. He was on Leasco's distribution list for financial statements and short form profit and loss reports. He requested and was given the detailed work sheets from which the December financial reports were prepared. These work sheets disclosed the Fruitvale Bridge project and the accounting treatment of the project. The only restriction imposed upon Taussig was that he could not inform the personnel of MKI that he was purchasing the company, because of the possible disruption this might cause.

■ If Taussig had taken advantage of the sources of information available to him, he probably would have learned about the design error. Under these circumstances, he should not be heard to complain that he relied upon the financial statements as an accurate and complete description of MKI's financial condition. Moreover, the error in the financial statement was not material. The Fruitvale Bridge project was due for completion in fiscal 1971 and was expected to produce revenues of $130,000. MKI's total projected annual revenues were $2,757,000. Thus, the Fruitvale Bridge project was expected to produce only about 5% of the total revenues. This cannot be said to be material.

■ We do not rely solely upon these circumstances to support our holding that Taussig was not justified in relying upon MKI's financial statements. The agreement itself specifically disclaimed any warranties or representations concerning MKI's financial condition. See Wittenberg v. Robinov, 9 N.Y.2d 261, 264, 213 N.Y.S.2d 430, 431, 173 N.E.2d 868, 869 (1961); Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

Paragraph 5(d) of the agreement provided:

"5. REPRESENTATIONS AND WARRANTIES OF LEASCO—Leasco represents and warrants to Taussig as follows:

\* \* \*

(d) *Disclaimer*—Except as set forth in this Agreement, Leasco

---

2. In March 1970, Taussig discussed with Leasco's Assistant Controller the various accounting methods used by MKI with regard to its projects. At trial Taussig admitted knowledge of MKI's accounting methods prior to signing the agreement.

makes no other representations and warranties with respect to MKI and the business thereof."

Nowhere in the agreement is there set forth a warranty that the profit and loss or other financial statements accurately represented the financial condition of MKI. Taussig contends that such a warranty is found in the following provisions of paragraphs 10(a) and 12:

"10. CONDITIONS PRECEDENT OF TAUSSIG—All of the obligations of Taussig under this Agreement are subject to the following conditions:

(a) *Representations and Warranties True at Closing*—The representations and warranties of Leasco contained in this Agreement or in any certificate or document delivered pursuant to the provisions hereof or in connection with the transactions contemplated hereby, shall be true on and as of the Closing Date as though such representations and warranties were made at and as of such date and Leasco shall have delivered to Taussig a certificate to that effect.

\* \* \*

12. NATURE AND SURVIVAL OF REPRESENTATIONS AND WARRANTIES—All statements contained in any certificate or other instrument delivered pursuant to this Agreement or in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the party delivering them. The representations, warranties and agreements made by the parties in this Agreement or pursuant hereto shall survive any Closing hereunder and any investigation at any time made by or on behalf of any of the parties."

The district court concluded that the only representations and warranties made by Leasco are those set forth in paragraphs 5(a), (b), (c) and 7 of the agreement.[3] We agree. We interpret "certificate or document delivered pursuant to the provisions hereof or in connection with the transactions contemplated hereby" (¶10(a)) to refer to those instruments to be delivered at or prior to the closing, as required by the four corners of the agreement. The January financial statements do not fall within that category.

The question as to who should bear the loss attributable to an error committed prior to the sale but not reported until thereafter is not one that the parties failed to consider when the agreement was entered into. The parties in their good faith bargaining antic-

---

3. Paragraph 5 contains the following representations and warranties:

"5. REPRESENTATIONS AND WARRANTIES OF LEASCO—Leasco represents and warrants to Taussig as follows:

(a) *Ownership of Stock*—Leasco on the Closing Date will be the owner, free and clear of any lien, pledge, charge or encumbrance, of all of the issued and outstanding capital stock of MKI, and the MKI stock shall constitute all of the issued and outstanding shares of capital stock of MKI on the Closing Date.

(b) *Organization*—Leasco is a corporation duly organized and existing and in good standing under the laws of the State of Delaware.

(c) *Authority*—The Board of Directors of Leasco has duly approved this Agreement and the transactions contemplated herein and has authorized the execution and delivery of this Agree-

ment by Leasco. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate authority of Leasco.

(d) *Disclaimer*—Except as set forth in this Agreement, Leasco makes no other representations and warranties with respect to MKI and the business thereof."

Paragraph 7 provides:

"7. BROKERAGE—Leasco and Taussig represent and warrant each to the other that all negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Taussig directly with Leasco and without the intervention of any person entitled to receive a finder's or broker's fee, originating commission or compensation in connection with or arising out of this transaction."

ipated the problem and allocated the risk of loss to Taussig. Absent any showing that this was unfairly done, the obligations assumed by the parties themselves will be enforced.

■ Taussig's contention that the misleading representations made in the financial reports violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1972), promulgated thereunder, is frivolous. Even if we were to assume that the misstatement was material, Taussig has not shown the requisite scienter for a private action under Rule 10b-5. We have held that mere negligence is insufficient; there must be a showing of knowledge of falsity or reckless disregard for the truth. Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2 Cir. 1971).

We agree with the district court that there was no material misrepresentation relied upon by defendant.

### III.

### RELIEF GRANTED

Taussig contends that, even if he did breach the contract, the district court erred in ordering specific performance.

The court found that Leasco could have sold MKI along with Berger, Inc., but did not do so because Taussig had agreed to purchase it; that the loan from The Bank of America, guaranteed by Leasco, had been increased by $200,000 at the request and direction of Taussig; and that MKI had decreased in value because after the agreement was entered into Taussig failed to devote substantial time to MKI's business affairs. Based on these findings, in addition to the fact that Leasco had been unsuccessful in attempting to sell MKI,

the court concluded that specific performance was the appropriate remedy.

The court further held, however, that the contract price was "excessive in terms of the present market". Consequently, it granted to the parties an opportunity to agree upon equitable price terms for Taussig's purchase of MKI. The court found that Taussig failed to bargain in good faith. It thereupon accepted Leasco's suggested price and ordered Taussig to tender to Leasco the sum of $169,000 in cash,[4] together with a release of Leasco from its guarantee to The Bank of America of $500,000 of outstanding loans. To enforce this order, the court further ordered, in the event Taussig should fail to perform on the closing date set by the court, March 15, 1972, that the Clerk enter judgment in favor of Leasco and against Taussig in amount of $669,000 plus interest. The court also ordered Leasco to tender the MKI shares to Taussig upon the latter's payment of the judgment. When Taussig failed to comply with the order of specific performance, judgment for damages in amount of $669,000 was entered against him.

In determining whether specific performance is an appropriate remedy, a court should consider all the circumstances of the case. In the instant action, the following facts indicate that the district court's grant of specific performance was proper.

Both Frederick Jackson and Bernard Schwartz, Chairman of the Leasco Executive Committee, vigorously attempted to sell MKI to another person after Taussig repudiated the agreement. They were unsuccessful. The district court found, and this is supported by substantial evidence, that Leasco probably could have sold MKI in combination with Berger, Inc. to Mr. Louis Berger.

---

4. This amount was determined as follows: In attempting to sell MKI, Leasco had obtained only one serious offer. Granat Management Company offered to purchase MKI for $100,000, but the deal did not go through. In arriving at its modified sales price, Leasco combined the amount of this offer with the amount of an advance—$69,000—which it had made to MKI after the Taussig agreement was entered into.

The latter in fact did purchase Berger, Inc. in April 1971.[5] MKI and Berger, Inc. were both involved in civil engineering on an international basis. Berger himself had promoted the acquisition of MKI to complement Berger, Inc. It therefore is reasonable to assume that Berger would have been willing to purchase MKI along with this acquisition of Berger, Inc. By foregoing a package sale to Berger of the two companies in the reasonable belief that Taussig would perform under the agreement, Leasco was placed in a position where it no longer could dispose of a company in which it had no ongoing interest.[6]

Before specific performance may be ordered, remedies at law first should be determined to be incomplete and inadequate to accomplish substantial justice. Erie R. Co. v. City of Buffalo, 180 N.Y. 192, 73 N.E. 26 (1904); 11 Williston on Contracts § 1418 (3d ed. 1968). The fact that there is a remedy at law, however, does not preclude equitable relief. Dailey v. City of New York, 170 App.Div. 267, 274, 156 N.Y.S. 124, 128 (1st Dept. 1915). We agree with the district court that substantial justice could not be achieved here without specific performance.

The problem which confronted the district court was that the most desirable solution—a sale of MKI to a third person, with damages to Leasco—was not possible. Leasco had tried to sell MKI but had been unsuccessful. Consequently, the court was compelled either to award damages, which would have burdened Leasco with a company it did not want (and could not handle), or to grant specific performance. We believe that the court reached the fair result. Taussig's repudiation of the contract after leading Leasco to forego a sale to Berger was the prime reason Leasco was unable to dispose of MKI. The increase in the Leasco loan guarantee, a direct result of the agreement, also made disposal of MKI more difficult. When a buyer's conduct makes it difficult if not impossible for a seller to dispose of the property elsewhere, specific performance is proper relief. See E. Errett Smith, Inc. v. Gibson Art Co., 15 Misc.2d 504, 181 N.Y.S.2d 707 (Sup. Ct., N.Y.Co., 1958).

Under the totality of the circumstances here,[7] the district court did not abuse its discretion in granting specific performance. See Gary v. Dane, 411 F. 2d 711, 713 (D.C.Cir. 1969).

## IV.

### LIMITED DISCOVERY

We have considered Taussig's claim that the district court erred in denying him full discovery and find it to be without merit.

Among other reasons, Taussig has failed to show how the limited discovery prejudiced the presentation of his defense, especially in view of the district court's invitation to Taussig to renew his request for additional discovery dur-

---

5. Berger Associates, the domestic division of Louis Berger, Inc., was sold in late 1971 to various vice-presidents and employees of that company. Thus, MKI is the only civil engineering company still owned by Leasco.

6. As part of the agreement between Leasco and Taussig, Leasco's guarantee of loans to MKI from The Bank of America was increased from $375,000 to $575,000. Taussig took full advantage of this increase by taking out $200,000 in additional loans. This increase obviously has made disposal of MKI more difficult since a purchaser now must release Leasco from a substantially larger guarantee.

7. There are other considerations in this case. Leasco divested itself of its other civil engineering companies because it found that these companies did not fit into its overall operations. Leasco does not possess the expertise to manage such companies effectively. Taussig, on the other hand, had had considerable experience with civil engineering in general and with MKI's activities in particular. He was familiar with MKI's operations and had demonstrated an ability to manage them efficiently. If one of the two parties were to control MKI, Taussig seemed the better choice if MKI were to survive.

ing the trial if he could show he was being prejudiced by the limited discovery. Taussig never availed himself of the court's invitation.

Affirmed.