Mary D. HAAS and John Mitchell, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

PITTSBURGH NATIONAL BANK, Mellon Bank, N.A. and Equibank, N.A., all national banking corporation, Defendants.

Civ. A. No. 72–968.

United States District Court,
W. D. Pennsylvania.

Aug. 22, 1980.

Michael P. Malakoff, Eugene B. Strassburger, III and James H. Joseph, Pittsburgh, Pa., for plaintiffs.

H. Woodruff Turner, Pittsburgh, Pa., for class action plaintiffs re attorneys' fees.

Allen N. Brunwasser, J. Tomlinson Fort, Alexander C. Sherrard and Donald C. Bush, Pittsburgh, Pa., for defendants.

## OPINION

ZIEGLER, District Judge.

### I. *History of Case*

On November 13, 1972, plaintiffs filed a class action against defendants challenging various interest and accounting practices pertaining to the use of Bank Americard and Mastercharge. On August 26, 1977, the district court approved a settlement of the claims totaling 2.76 million dollars.[1]

In three separate settlement agreements the parties resolved, *inter alia,* that defendants would pay interest on the settlement funds in an amount equal to the prevailing passbook savings rate. Interest was to be computed from the date of the order approving the settlement, i. e., August 26, 1977, to the date of the final award of counsel fees and costs.[2] Due to the ongoing and acrimonious controversy concerning fees for class counsel, distribution of the funds has been delayed. The monies remain deposited with defendants and are earning interest in excess of the passbook savings rate. The differential has been substantial. For example, in May of 1980, the dichotomy between the prime and passbook rates totaled 13.25 percent.[3]

Presently before the court is the motion of plaintiffs to reform the settlement agreements and require defendants to pay a higher rate of interest on the funds to be paid to the class. Plaintiffs contend that since the passbook savings rate of 5¼ per-

1. Defendants agreed to contribute the following sums: Pittsburgh National Bank–$1,450,000; Mellon Bank–$1,250,000; and Equibank–$60,-000.

2. The settlement agreements dated March 25, April 6 and April 18, 1977, are attached as

Appendix 1 to defendants' brief in opposition to the motion for payment of additional interest on the settlement funds.

3. *See* Exhibit B to plaintiffs' brief.

cent has failed to keep pace with the prime rate, defendants are reaping a windfall due to the delay in resolving the fee question. In sum, plaintiffs invoke the doctrines of mutual mistake, frustration of purpose, and constructive trust, as well as the general supervisory power of the district court over class actions, in order to rewrite the settlement agreements. In our judgment, these contentions are without merit and the motion must be denied.

## II. *Discussion*

### A. *Jurisdiction*

During the course of the fee proceedings required in this Circuit,[4] The Honorable Hubert I. Teitelbaum of this court recused himself from consideration of the question. An appeal was taken from that order and the issue is presently before the United States Court of Appeals for the Third Circuit. Accordingly, before we can address the merits of the instant motion, we must determine whether the appeal of the order of recusal divests this court of jurisdiction.[5]

▪ The filing of a timely and sufficient notice of appeal transfers jurisdiction from the district court to the Court of Appeals with respect to any matters involved in the appeal. 9 Moore's Federal Practice, ¶ 203.11 at 739 (2d ed. 1979); *S. E. C. v. Investors Security Corp.*, 560 F.2d 561, 568 (3d Cir. 1977). We are satisfied that the issue before the Court of Appeals bears no relation to any decision we may reach on plaintiffs' motion, *see Silberman v. Bogle*, 486 F.Supp. 70 (E.D.Pa.1980), and we hold that this court has jurisdiction to adjudicate the matter.

### B. *Mutual Mistake*

▪ Plaintiffs contend the parties made a mutual mistake when they agreed that interest would be added to the settlement funds in an amount equal to the passbook savings rate. They argue that the parties

did not foresee the rise in the prime rate or the delay engendered by the counsel fee dispute and the court should invoke the doctrine of mutual mistake to reform the settlement agreements to comport with the true intention of the parties.

The Restatement (Second) of Contracts § 293 (Tent. Draft No. 10, 1975) provides that "a mistake is a belief that is not in accord with existing facts." The erroneous belief must relate to the facts "as they exist at the time of the making of the contract." *Id.* at Comment a. Thus, "[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here." *Id.* Illustration No. 2 to § 293 is instructive. It provides:

> A contracts to sell and B to buy stock amounting to a controlling interest in C Corporation. At the time of making the contract, both A and B believe that C Corporation will have earnings of $1,000,000 during the following fiscal year. Because of a subsequent economic recession, C corporation earns less than $500,000 during that year. Although B may have shown poor judgment in making the contract, there was no mistake of either A or B, and the rules stated in this Chapter do not apply.[6]

*Id.* at Comment a, Illustration 2.

In this case, plaintiffs' failure to forecast the rise in the prime rate may similarly reflect poor judgment. The prime rate rose to 12 percent in 1974 and we cannot say that the increase of the past few years was not anticipated by any of the parties. Moreover, in light of counsel's extensive experience in class action litigation, the delay in final approval of a reasonable fee should come as no surprise.

*Beecher v. Able*, 575 F.2d 1010 (2d Cir. 1978) is apposite. There the parties entered into a stipulation of settlement of a class

---

4. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) (Lindy I); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976) (Lindy II).

5. The case was assigned to this member of the court following recusal by Judge Teitelbaum.

6. This illustration is based on *Leasco Corp. v. Taussig*, 473 F.2d 777 (2d Cir. 1972).

action and the defendant agreed to pay the sum of 5 million dollars. The stipulation also provided that "if the settlement is finally approved and consummated, no part of the settlement fund will revert to [defendant], regardless of the number and the amount of claims allowed against the fund." 575 F.2d at 1013.

Some months later, the parties informed the court that only 1.3 million dollars in claims had been submitted. The defendant petitioned the district court to reform the settlement agreement to recover the unclaimed portion of the fund contending that reformation was necessary in order to avoid a "windfall" to those class members who had filed claims. *Id.* at 1015. The district court denied the motion and the Court of Appeals for the Second Circuit stated:

> [R]eformation would be proper here only if Douglas could show that the parties had anticipated this possibility and had verbally agreed that in the event that claims were very low a portion of the fund would be allowed to revert to Douglas, but that this verbal agreement was mistakenly or inadvertently omitted from the written settlement agreement. As noted above, however, Douglas' contention here is not that this had been the parties' intention at the time of the agreement but rather that the parties had not considered this possibility at all. Even if the parties were mistaken in their assessment of the potential number of claimants against the fund, as Douglas contends, this would not be a basis for relief by reformation. 'A mistake as to the existing situation, which leads either one or both of the parties to enter into a contract which they would not have entered into had they been apprised of the actual facts, will not justify reformation.' *Russell v. Shell Petroleum Corp.,* [66 F.2d 864 (10th Cir. 1933)] *supra.*

The Court concluded:

> Furthermore, there is no evidence that the inclusion of this non–reversion provision in the settlement agreement was a result of misrepresentation or undue influence on the part of counsel for plain-

tiffs. . . . The fact that this settlement, freely entered into by experienced counsel on both sides, has in light of subsequent events proven to be more beneficial to the plaintiff classes than to Douglas does not now provide a basis for the agreement to be set aside.

*Id.* at 1015–1016. *See also, McNamara Construction of Manitoba, Ltd. v. United States,* 509 F.2d 1166 (Ct.Cl.1975).

The reasoning of *Beecher* is persuasive. Here, as there, one party is requesting modification of a specific provision of a settlement agreement. Similarly, the predicate for relief is the "windfall" to a party from continued application of that provision. Finally, as in *Beecher,* the inclusion of the interest provision resulted from the good faith and arms length negotiations between experienced counsel.

Plaintiffs' reliance on *Alcoa v. Essex Group, Inc.,* No. 78–598 (W.D.Pa. April 7, 1980) is misplaced. In *Alcoa,* the district court reformed a long-term contract on the grounds of mutual mistake, frustration of purpose and commercial impracticability. The court found a mutual mistake of fact when the parties agreed to employ the wholesale price index as the formula for escalating non–labor costs over the term of the contract. The court was cognizant of Section 293 of the Restatement (Second) of Contracts and its distinction between mistakes existing at the time of the execution of a contract and the failure to predict future events. Thus, the court stated: "the parties' mistake [was] . . . one of fact rather than one of . . . prediction of future events." *Id.* at 16. The wholesale price index was found to be an "actuarial" measure which the parties believed from the outset would accurately reflect out–of–pocket costs. *Id.* It is evident that the *Alcoa* court did not find a mutual mistake on the basis of a change in economic conditions; rather, its holding was based on the finding of a mistake in the selection of the price index as the device to measure these changes.

The court is confronted here, at best, with a risk that resulted from the inability

of the parties to predict future events. As the Restatement and other authorities make clear, such risks are distinct from bona fide mutual mistakes of fact and provide no basis for reformation of a contract.

### C. Frustration of Purpose

Plaintiffs next contend that due to the dramatic rise in the prime rate of interest, plaintiffs' counsel's purpose in including the passbook savings interest provision in three separate settlement agreements has been frustrated. We are urged to apply the doctrine of frustration of purpose and reform the agreements to require defendants to pay a higher rate of interest.

Restatement (Second) of Contracts § 285 (Tent. Draft No. 9, April 8, 1974) provides:

DISCHARGE BY SUPERVENING FRUSTRATION.

Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non–occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Under this principle, a party is discharged from performing a duty under a contract only where his principal purpose is "substantially" frustrated by the occurrence of a supervening event. "It is not enough that the transaction has become less profitable . . . or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract." *Id.* at Comment a. As Professor Corbin has observed:

Variations in the value of a promised performance, caused by the constantly varying factors that affect the bargaining appetites of men, are the rule rather than the exception. Bargainers know this and swallow their losses and disappointments, meantime keeping their promises. Such being the business mores, court decisions that are not in harmony with them will not make for satisfaction or prosperity. Relief from duty, outside

of the bankruptcy court, can safely be granted on the ground of frustration of purpose by the rise or fall of values, only when the variation in value is very great and is caused by a supervening event that was not in fact contemplated by the parties and the risk of which was not allocated by them.

Corbin, Contracts Vol. 6, § 1355 (1962).

In the instant case, assuming counsel for plaintiffs had insisted on the inclusion of a provision which required interest at a rate commensurate with the prevailing prime rate, the class would have benefited. However, in view of the increase in the prime rate to 12 percent three years prior to these agreements, and counsel's extensive experience in class action fee proceedings, we are unable to conclude that the rise in prime and the delay in final approval of a fee are not risks fairly assumed. The doctrine of frustration of purpose provides no basis for reformation.

### D. Constructive Trust

A constructive trust arises "[w]here a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." Restatement of Restitution § 160 (1937); *Moreland v. Metrovich,* 249 Pa.Super. 88, 375 A.2d 772, 776 (1977). Fraud or other wrongdoing is not a requirement for imposition of a constructive trust; however, a defendant must have acquired the property in a manner that "creates [an] equitable duty in favor of the plaintiff." *Pierro v. Pierro,* 438 Pa. 119, 127, 264 A.2d 692, 696 (1970). As Professor Scott has stated:

A constructive trust, as we have seen, is imposed in order to prevent unjust enrichment. This unjust enrichment may arise out of the wrongful acquisition of the title to property. This is the case where the title is acquired by fraud or duress or undue influence, or where it is acquired by the wrongful disposition of another's property, or where it is ac-

quired by a person in a fiduciary relation to another in violation of his duty as fiduciary . . . . [A] constructive trust arises where the title to property is acquired through a mistake, or where property is transferred by a trustee or other fiduciary, in violation of his duty as fiduciary, to a person who has no notice of the violation of duty but who pays no value.

A. W. Scott, *Trusts* § 462.2 (3d ed. 1967). Here, we cannot say that defendants have been unjustly enriched so as to create an equitable duty to plaintiffs. The banks are holding the monies in accordance with the terms of settlement agreements reached after arms length negotiations between able and experienced counsel. There is no allegation or evidence of unfair advantage stemming from superior knowledge or influence, and under these circumstances, imposition of a constructive trust is inappropriate.

E. *The Supervisory Power of the Court*

■ As a final argument, plaintiffs urge this court to exercise its supervisory power under Rule 23 of the Federal Rules of Civil Procedure and reform the agreements to require defendants to pay additional interest on the funds to be paid at distribution.

It is well settled that "[u]ntil the fund created by [a] settlement is actually distributed, the court retains its traditional equity powers . . . to protect unnamed, but interested persons." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972).

In our judgment, it would be unfair to defendants to exercise the equitable power of this court to provide the relief sought here. The interest rate restriction was negotiated in good faith and such rates do fluctuate. As we have also noted, counsel for plaintiffs is a prominent class action practitioner who is aware of the frequent delays which relate to fee awards following settlement of the claims of the class members. Accordingly, we decline to exercise our supervisory power to reform the settlement agreements.