

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-5-2009

# Swiss Reinsurance v. Airport Ind Park Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3749

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

## Recommended Citation

"Swiss Reinsurance v. Airport Ind Park Inc" (2009). *2009 Decisions.* Paper 1404.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1404

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3749
_____

SWISS REINSURANCE AMERICA CORPORATION,
for itself and as Reinsurer of AMWEST
SURETY INSURANCE COMPANY in Liquidation,
Appellant

v.

AIRPORT INDUSTRIAL PARK, INC., d/b/a P.E.C. Contracting Engineers;
PESH, INC.; PAUL EDWARD CHAMBERS;
NANCY DEFAZIO, a/k/a Nancy D. Chambers
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 05-cv-1127)
District Judge: Honorable Terrence F. McVerry
_____

Argued March 24, 2009

Before: RENDELL, AMBRO and JORDAN, *Circuit Judges.*

(Filed: May 5, 2009)
_____

Theodore M. Baum   [ARGUED]
Ernstrom & Dreste, LLP
1800 Canal View Blvd. - #600
Rochester, NY   14623
      *Counsel for Appellant*

Joseph E. Linehan
Richard T. Victoria   [ARGUED]
Meyer, Unkovic & Scott
535 Smithfield Street - #1300
Pittsburgh, PA   15222

Samuel F. Reynolds, Jr.
Weisman Goldman Bowen & Grzywinski, LLP
Grant Building - #1200
310 Grant Street
Pittsburgh, PA   15219-2243
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Through this suit, Appellant Swiss Reinsurance America Corp. ("Swiss Re") seeks to recover from the Appellees under common law indemnification principles and as an intended beneficiary to a general indemnity agreement (the "Agreement") between Appellees and Amwest Surety Insurance Co. ("Amwest").[1]  The United States District Court for the Western District of Pennsylvania granted Appellees' motion for summary judgment and denied Swiss Re's motion for partial summary judgment, reasoning that

---

[1]The Appellees are Airport Industrial Park, Inc., d/b/a P.E.C. Contracting Engineers ("PEC"), PESH, Inc. (a related company to PEC), Paul E. Chambers (an officer of PEC), and Nancy DeFazio (Chambers's wife).  They are all signatories to the Agreement and have identical interests on appeal.

It is not clear why Swiss Re included Amwest in the caption of this case.  *See* Fed. R. Civ. P. 17 advisory committee's notes (1966) ("[T]he enumeration [in Rule 17(a)] states that the promisee in a contract for the benefit of a third party may sue as real party in interest; it does not say, because it is obvious, that the third-party beneficiary may sue (when the applicable law gives him that right[])[.]").

2

Amwest's insolvency constituted, alternatively, a failure of consideration, an excuse of performance, or a frustration of the Agreement's purpose. *Swiss Reinsurance Am. Co. v. Airport Indus. Park, Inc.*, No. 2:05-cv-01127, 2007 WL 2464504 (W.D. Pa. Aug. 27, 2007). Because the record is insufficiently developed to determine whether the Agreement is enforceable and, if it is enforceable, whether Swiss Re is entitled to indemnification, we will vacate the District Court's order granting summary judgment in favor of Appellees and remand for further proceedings.

## I.      Background

Because we write primarily for the parties, we focus on the facts essential to our decision. The Agreement, signed by Appellees in 1995,[2] states that it was "executed ... for the purpose of indemnifying [Amwest], herein referred to as 'Surety,' in connection with any Bonds written on behalf of [PEC], herein referred to as 'Principal.'" (App. at 493.) The term "Surety" is further defined to include Amwest's "affiliates, subsidiaries or reinsurers, and any other person(s) or entity(ies) which the Surety may procure to act as a Surety or as a Co-Surety on any Bond, or any other person or entity who executes a Bond at the request of Surety." (*Id* ¶ 1.) Through the Agreement, Appellees bound themselves to indemnify and hold the Surety harmless for any and all "demands, liabilities, losses, costs, damages, attorneys' fees and expenses of whatever kind or nature

---

[2]The Agreement is on Amwest letterhead, but Amwest did not sign it.

which arise by reason of, or in consequence of, the execution by the Surety of any Bond on behalf of the Principal."  (*Id*. ¶ 2.)

Approximately three-and-a-half years after Appellees signed the Agreement, the Army Corps of Engineers (the "Corps") awarded PEC a contract to construct a new dock front on Neville Island, near Pittsburgh, Pennsylvania (the "Neville Island Project").  In accordance with the Miller Act, 40 U.S.C. § 270a (1994) (current version at 40 U.S.C. §§ 3131-3132), PEC secured a payment bond in the amount of $1,858,772.40 and a performance bond in the amount of $4,146,931.00.  Amwest, as the surety, issued those bonds with the United States as obligee and PEC as principal.[3]  Because Amwest had a Treasury Department underwriting limit, it had to obtain reinsurance to the extent that the bonds it issued exceeded $2 million.  To that end, Amwest and Swiss Re entered into a reinsurance agreement obligating Swiss Re to pay the United States up to $2,646,931.00 in the event that Amwest failed to pay any default under the performance bond.[4]  Swiss Re did not provide reinsurance for the payment bond, evidently because that bond did not exceed Amwest's underwriting limit.

The parties' stories start to diverge after the issuance of the bonds.  According to Swiss Re, PEC's progress on the Neville Island Project was abysmal.  In support of that

---

[3]Nothing in the record indicates that Amwest issued any bonds on behalf of PEC other than in connection with the Neville Island Project.

[4]Swiss Re does not explain why the reinsurance amount is $500,000 more than the excess amount of the performance bond.

contention, Swiss Re submitted to the District Court an affidavit of Jerry Brewer, a Corps Engineer, stating that "PEC's progress on the Project work was very slow, almost from the beginning of the Project." (App. at 403-04.) According to Brewer, PEC's agreement with the Corps required it to finish the project by August 17, 2001, yet, by July 2001, PEC was only about halfway done. Brewer also stated that the Corps was receiving reports from PEC's subcontractors that they were having trouble getting paid by PEC. In addition, Joseph Elwell, who served as the Authorized Representative for the Corps's Contracting Officer, attested in an affidavit that he repeatedly informed PEC that its progress was unsatisfactory.

Appellees, in contrast, say that PEC's progress was not behind schedule. Chambers testified at his deposition that the "scope of the work changed dramatically" in August of 2000, which made it difficult to quantify PEC's progress. (App. at 601, 609.) As to subcontractor payment, Chambers believed that, if there was any problem at all, it was that a subcontractor may have been overpaid. In any event, Chambers testified that the Corps informed PEC that any such issues were "minor." (App. at 607.)

Both sides do agree that there was at least one serious problem relating to PEC's obligations. On June 7, 2001, a court in Nebraska declared Amwest to be insolvent and entered an order of liquidation, resulting in the cancellation of its bonds.[5] On July 31, the

---

[5]According to Elwell, the cancellation of the payment bond was "the straw that broke the camel's back," (App. at 439 ¶ 13) yet both Elwell and Brewer stated in their affidavits that "it would not be accurate to say that the liquidation of Amwest caused PEC to be

5

Corps sent PEC a notice that it was in danger of being in default and that it had ten days to cure three conditions, one of which was PEC's failure to provide an acceptable payment bond.

PEC apparently failed to cure any of the stated conditions or to respond to the July 31 cure notice. By letter dated August 17, the Corps terminated its contract with PEC, stating that PEC had "failed to make adequate progress, ... failed to provide an acceptable Payment Bond, and ... failed to pay [its] subcontractors in accordance with the contract provisions." (App. at 433.) In addition, the Corps notified Swiss Re that it had terminated PEC and that Swiss Re should advise the government of whether it wanted to arrange for completion of the Project. The United States Court of Federal Claims subsequently determined that the government's decision to terminate PEC was justified because PEC "failed to maintain adequate payment bonding as required by its contract." *Airport Indus. Park, Inc. v. United States*, 59 Fed.Cl. 332, 337 (2004).

Swiss Re contracted with the Corps to complete the Neville Island Project.[6] It then filed this suit, alleging that Appellees, as indemnitors to Amwest and under common law indemnification principles, owed it over $1,450,000 in losses.

---

default terminated." (App. at 406 ¶ 13; 440 ¶ 15.)

[6]Although the parties do not say when the work on the Neville Island Project was completed, Swiss Re included with its complaint the records of its expenditures. Those are dated from November 6, 2001 to March 28, 2005.

## II.    Discussion[7]

Swiss Re argues that the District Court erroneously granted Appellees' motion for summary judgment and likewise erroneously denied its motion for partial summary judgment.  It contends that it is a third-party beneficiary to the Agreement, which unambiguously obligates Appellees to indemnify Swiss Re for its losses.  According to Swiss Re, because the performance and payment bonds were separate, Amwest's failure to maintain the payment bond could not and did not absolve Appellees of its obligations under the performance bond, and the District Court thus erred in holding the Agreement unenforceable.  Even absent the Agreement, however, Swiss Re argues that Pennsylvania common law makes a defaulting principal liable to a party that suffers damages as a result of completing the defaulting principal's obligations under a construction contract.

In Pennsylvania,[8] an indemnity agreement is to be construed using the law applicable to contracts generally.  *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa. Super. Ct. 2000).  The interpretation of a contract is a matter of law.  *Hutchinson*

---

[7]The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review over an appeal from a grant of summary judgment, which means we apply the same standard used by the District Court.  *Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.*, 264 F.3d 365, 369 (3d Cir. 2001).  Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Id.* (citing Fed. R. Civ. P. 56(c)).  "In making this determination, we must consider the evidence in the record in the light most favorable to the nonmoving party."  *Id.*

[8]The District Court held that Pennsylvania contract law applies, a holding the parties do not dispute on appeal.  *Swiss Reinsurance*, 2007 WL 2464504, at *3.

*v. Sunbeam Coal Corp.*, 513 Pa. 192, 201, 519 A.2d 385, 390 (1986). "Determining the intention of the parties is a paramount consideration in the interpretation of any contract. ... The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous." *Id.* at 389-90 (citations omitted).

A.    *Swiss Re's Status as an Intended Beneficiary*[9]

We agree with Swiss Re that it is an intended beneficiary of the Agreement. Amwest asked Appellees to "indemnify and hold the Surety harmless," defining "Surety" to include Amwest's "reinsurers." (App. at 493a ¶¶ 1-2.) That language clearly establishes that the parties intended to give Swiss Re the benefit of indemnification. *See Guy v. Liederbach*, 501 Pa. 47, 60, 459 A.2d 744, 751 (1983) (holding that plaintiff is a third party beneficiary when it is clear that promisee intends to give beneficiary the benefit of the promised performance); *Commercial Ins. Co. of Newark v. Pacific-Peru Constr.*, 558 F.2d 948, 953-54 (9th Cir. 1977) (relying on language in indemnity agreement between surety and principal to treat reinsurer as intended beneficiary). Appellees make the remarkably unpersuasive argument that Amwest did not intend Swiss Re to benefit in the event that Amwest became insolvent. Contrary to their assertions,

---

[9]The Pennsylvania Supreme Court has stated its preference for the term "intended beneficiary" rather than the generalized term "third party beneficiary," which can refer to either an "intended beneficiary" or an "incidental beneficiary." *Chen v. Chen*, 586 Pa. 297, 301 n.5, 893 A.2d 87, 89 n.5 (2006).

there is nothing in the Agreement indicating that the parties intended in any way to limit the circumstances in which a reinsurer could seek indemnification.[10]

B.    *Enforceability of the Agreement*

As an intended beneficiary, Swiss Re was subject to certain defenses that Appellees would have had against Amwest, as the District Court correctly recognized. *Swiss Reinsurance*, 2007 WL 2464504, at *3 (citing *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098 (3d cir. 1996)).  We are unconvinced, however, that the District Court was correct in holding that the Agreement is unenforceable.  First, we think it clear that the parties contemplated the possibility that Amwest might cancel its bonds and that Appellees agreed to bear that risk.  Appellees gave Amwest "the right, at [the Surety's] option and in its sole discretion, to issue *or cancel* or decline the execution of any Bond."  (App. at 494 ¶ 8.F. (emphasis added).)  Thus, the cancellation of the payment bond could not have been a frustration of purpose.  *See Haas v. Pittsburgh Nat'l Bank*, 495 F. Supp. 815, 819 (W.D. Pa. 1980) (defining frustration of purpose as an event "'the non-occurrence of which was a basic assumption on which the contract was

---

[10]Because the Agreement governs the Appellees' indemnification obligations, Swiss Re's reliance on common law indemnification principles is misplaced. *See Fidelity & Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) ("'[R]esort to implied indemnity principles is improper when an express indemnification contract exists.'") (quoting *Commercial Ins. Co. of Newark*, 558 F.2d at 953).

made.'") (quoting Restatement (Second) of Contracts § 285 (Tent. Draft No. 9, April 8, 1974)).[11]

Additionally, Appellees' agreement to indemnify Amwest and its reinsurers was "[i]n consideration of the execution and delivery by the Surety of a Bond or any Bonds on behalf of the Principal." (App. at 493 ¶ 2.) Whether consideration was received and whether Amwest fulfilled its obligations under the Agreement therefore depends on whether it "execut[ed] and deliver[ed] ... a Bond or any Bonds." Again it seems clear, and Appellees do not dispute, that Amwest delivered the performance and payment bonds. *See* BLACK'S LAW DICTIONARY 440 (7th ed. 1999) (defining "delivery" to mean "[t]he formal act of transferring or conveying something"). The bonds were also executed, in the sense that Amwest signed the bonds. However, we hesitate to say that, in the context of government construction contracts, "execution" generally means no more than that. *Cf. id.* at 589-90 (defining "execution" to mean "[v]alidation of a written instrument, such as a contract or will, *by fulfilling the necessary legal requirements*" (emphasis added)).[12]

---

[11]Appellees do not defend the District Court's frustration of purpose holding.

[12]The Agreement uses "execution" and "executed" elsewhere, but the uses do not help to define the term. As noted, the preamble states that the Agreement "is executed by the Undersigned," implying a mere signing. (App. at 493; *see id*. at 495 ¶ 8.K ("The Surety may, at its option, file or record this Agreement or any other document executed by any or all of the Undersigned ... .").) The Agreement also states that the Surety has the right to "decline the execution of any Bond," which suggests that an "execution" is a one-time event rather than an ongoing obligation. (*Id*. at 494 ¶ 8.F.) Elsewhere, however, the meaning is less clear. (*See id*. at 495 ¶ 8.O ("In the event any of the Undersigned shall

Neither side to this appeal has shed any light on the meaning of "execution." Appellees provide the conclusory argument that "it can be reasonably expected or deduced that Amwest was obligated to execute, deliver and maintain *financially sound bonds*." (Appellee Br. at 11 (emphasis in original).) But it is disingenuous to say that Amwest had an obligation to "maintain" the bonds when the Agreement only requires execution and delivery, and, moreover, when it expressly provides Amwest with the unilateral right to cancel the bonds.

Swiss Re simply contends that the language of the Agreement is unambiguous. Were that so, this case would be a good deal easier to resolve. There is some ambiguity, as we have noted.[13] But, even if there were not, that would not necessarily mean we could proceed with an interpretation of the contract. Instead, even when a contract is unambiguous, Pennsylvania law allows courts to consider evidence of custom and usage. "In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract." *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 566 Pa. 494, 501, 781 A.2d 1189, 1193 (2001).

---

fail to execute this instrument ... .").) And the Agreement reveals that where Amwest wanted to refer to a mere signing of a bond, it knew how to do so. (*See id*. ¶ 8.R ("The liability of the Undersigned hereunder shall not be affected by: (a) the failure of the Principal to sign any bond ... .").)

[13]*See* n. 12, *supra*.

Although cases do not typically require resort to custom and usage when the parties have not presented such evidence, in this case both sides recognized at oral argument that such evidence, while not currently in the record, would be helpful in determining the meaning of the Agreement. Moreover, this case deals with a specialized field of business, government construction contracts, and such contracts are often litigated in the United States Court of Federal Claims, an expert and specialized tribunal. Parties working in that field may understand the argot of their business and see no need to define terms. They may be able to juggle multiple meanings of a term, with no need for explanation. For us to understand what it means to "execute" a bond, however, evidence of custom and usage may well be of assistance, and it may assist the District Court as well. It is therefore appropriate for us to vacate and remand to allow the District Court an opportunity to reevaluate the Agreement with the benefit of any evidence of custom and usage that the parties wish to present. *See Sunbeam Corp.*, 781 A.2d at 1195 (remanding for determination as to whether specialized usage existed in insurance contracts).

Even if, as Appellees assert, Amwest were required to "maintain financially sound bonds" as part of its obligation to execute and deliver such bonds, that does not answer the question of whether Amwest's failure to maintain a financially sound payment bond affected Swiss Re's right to seek indemnification for payments made in connection with reinsuring the performance bond. Although the performance bond was also apparently cancelled due to Amwest's insolvency, the reinsurance provided by Swiss Re was very

12

clearly not cancelled and might qualify as a separate "Bond" under the Agreement. Thus, the term "Bond," can also be usefully explored on remand, since its definition might show that Swiss Re provided consideration notwithstanding any failure of consideration provided by Amwest. Through its broad definition of "Surety," the Agreement expressly allows for consideration to be provided by a third party. Further, the Agreement defines a "Bond" as "*[a]ny* contractual obligation undertaken by Surety for Principal, before or after the date of this Agreement and any renewal or extension of said obligation." (App. at 493 ¶ 1 (emphasis added).) The reinsurance agreement appears to have been undertaken by Swiss Re for PEC at least as much as the performance and payment bonds were undertaken by Amwest. It names PEC as the principal on the performance bond and states that its purpose and intent "is to guarantee and indemnify the United States against loss under the performance bond." (App. at 534.) Indeed, the Agreement recognizes that certain, separate obligations that are ancillary to other bonds are also bonds, saying, for example, that "[a]fter the effective date of ... termination by giving notice, the Undersigned shall nonetheless be liable hereunder for: ... Any maintenance or *guarantee Bonds* executed incidental to any other Bond executed prior to such date ... ." (App. at 495 ¶ 11 (emphasis added).)

As with the definition of "execution," we think that the District Court, with assistance from the parties, is in the best position to address in the first instance whether it would be customary to include Swiss Re's reinsurance agreement as a "Bond," as defined

13

in the Agreement. If so, because there is no allegation that Swiss Re failed to execute (however defined) its reinsurance obligations, it seems likely that Swiss Re would be entitled to enforce the Agreement.[14]

C.   *Swiss Re's Right to Indemnification*

If, on remand, the District Court deems the Agreement enforceable, Swiss Re's right to indemnification would still be subject to any defenses arising from its own conduct. *See Johnson v. Pa. Nat. Ins. Cos.*, 527 Pa. 504, 508, 594 A.2d 296, 299 (1991) ("The rights of an alleged third party beneficiary may [rise] no higher than the rights of the parties to the contract ... .") (quotation omitted); Restatement (Second) of Contracts § 309(4) ("A beneficiary's right against the promisor is subject to any claim or defense arising from his own conduct or agreement."). The Agreement makes Appellees liable for certain amounts Swiss Re paid "in good faith under the belief that 1) Principal was in default as hereinafter described in Section 3 of this agreement; 2) surety was or might be liable therefor; 3) such payments were necessary or advisable to protect any of surety's rights as to avoid or lessen surety's liability or alleged liability." (App. at 493 ¶ 2.A.)

Appellees assert that "[b]ecause Amwest caused PEC to commit a material breach of PEC's contract with the United States, then Swiss Re, in the shoes of Amwest, should

_____

[14]As Judge Rendell correctly notes, Appellees failed to raise the definitional issues we highlight here. Similarly, Swiss Re did not directly raise the issue of whether its reinsurance agreement qualifies as a "Bond" separate and apart from the Amwest-issued performance bond. The District Court is in the best position to consider these issues in the first instance, with the benefit of any custom and usage evidence the parties choose to provide.

14

not be able to obtain an indemnity under the [Agreement] ... ."  (Answering Br. at 6-7.)

In other words, Swiss Re cannot be the beneficiary of any indemnity because the fault for

PEC's breach is, according to Appellees, wholly Amwest's, and the parties would have to

have been more explicit about indemnifying for such wrong-doing.  *Cf. Greer v. City of

Philadelphia*, 568 Pa. 244, 248, 795 A.2d 376, 379 (2002) ("'[I]f parties intend to include

within the scope of their indemnity agreement a provision that covers losses due to the

indemnitee's own negligence, they must do so in clear and unequivocal language.'")

(quoting *Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 7, 588 A.2d 1, 4 (1991)).[15]  We are not

encouraging the mounting of new contentions in the case, but we do suggest that the

parties directly address the issue of the apportionment of fault for the breach, should the

District Court deem it relevant on remand.[16]

---

[15]The *Greer* court referred to the quoted declaration as the "*Perry-Ruzzi* rule."  795
A.2d at 379 (citing *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907), and *Ruzzi*, 588 A.2d at
4).

[16]We do not mean to imply that a finding, if any, regarding apportionment of fault
would be dispositive as to whether Swiss Re made payments "in good faith" (App. at 493
¶ 2.A), but it may be relevant.

## III. Conclusion

For the foregoing reasons, we will vacate the District Court's order granting summary judgment in favor of Appellees and remand for proceedings consistent with this opinion.

RENDELL, Circuit Judge, Concurring in Part and Dissenting in Part.

While I agree with the majority that the District Court should not have granted summary judgment in favor of Appellees, further development of the record is not required. The case can and should be decided based on the plain language of the general indemnity agreement signed by Appellees in 1995 (the "Agreement"). The Agreement unambiguously obligates Appellees to indemnify "Surety" which, by definition, includes Swiss Re. I would reverse and grant summary judgment in favor of Swiss Re, and remand solely for a determination of damages. I must therefore respectfully dissent.

Under the Agreement, Appellees promised to indemnify "the Surety" for various expenses the Surety might incur "which arise by reason of, or in consequence of, the execution by the Surety of any Bond on behalf" of Appellees. (App. at 493.) The definition of "Surety" expressly includes reinsurers.[17] "Bond" is defined as, "*Any contractual obligation* undertaken by Surety" for Appellees. (*Id.* at ¶ 2) (emphasis added). The Agreement was a unilateral contract, signed only by Appellees, by which

---

[17]Paragraph 2 of the Agreement specifically defines "Surety" to include Amwest, "its affiliates, subsidiaries *or reinsurers*, and any other person(s) or entity(ies) which the Surety may procure to act as Surety or as Co-Surety on any Bond, or any other person who executes a Bond at the request of Surety." (emphasis added).

16

Appellees' promises would become binding upon "the execution and delivery by the Surety of a Bond or any Bond on behalf of" Appellees. (*Id.* at ¶ 2.) Swiss Re executed and delivered a contractual obligation on behalf of Appellees in the form of a $2.6 million reinsurance agreement on the Performance Bond, and fulfilled its obligation under that agreement by completing the Neville Island Project after Appellees had been terminated. Appellees therefore are directly bound to indemnify Swiss Re independent of Appellees' relationship to Amwest or any other Surety.

The Agreement contains no provision excusing Appellees' obligations to a Surety based on another Surety's default. There is no incorporation of other agreements and no condition to Appellees' obligations. If Appellees had wanted to provide for some exceptions to its indemnity obligations to any Surety based on any other default or breach it could have said so. On such points, the Agreement is silent.

I suggest that we will unnecessarily disrupt commercial dealings by reading into the Agreement a requirement that the fulfillment of bond obligations by one Surety is a necessary pre-condition to the principal's obligation to a reinsurer Surety. To the contrary, Swiss Re had the right, under the plain language of the Agreement, to rely on a direct obligation of indemnity running to it from Appellees, so long as Swiss Re delivered a reinsurance contract and fulfilled its obligations under the contract — which it did.

Moreover, while industry custom and usage may shed additional light on the terms "execute" and "bond," Appellees raised no such arguments on appeal or before the

17

District Court.  I see no reason to give Appellees, *sua sponte*, another opportunity to litigate their case.

I would accordingly reverse the order of the District Court granting summary judgment to Appellees and denying summary judgment to Swiss Re on the issue of liability, and remand the matter for the District Court to determine damages.