**SWISS REINSURANCE AMERICA CORPORATION, a New York corporation, Plaintiff,**

v.

**SUPERVALU, INC. a Delaware corporation, Defendant.**

Civ. No. 09–3083 (JJK).

United States District Court, D. Minnesota.

Oct. 14, 2010.

Joel T. Weigert, Esq., Meagher & Geer, P.L.L.P; and Marilyn Klinger, Esq., and Stephen A. Leys, Esq., Sedgwick, Detert, Moran & Arnold LLP, for Plaintiff.

Kim Ruckdaschel–Haley, Esq., Lindquist & Vennum P.L.L.P, for Defendant.

## OPINION AND ORDER

JEFFREY J. KEYES, United States Magistrate Judge.

### INTRODUCTION

In this insurance dispute, Swiss Reinsurance America Corporation ("Swiss Re") seeks to recover $106,617.53, plus $53,180.07 in attorneys' fees and expenses from SuperValu, Inc. ("SuperValu") for payments that Swiss Re made to resolve an underlying litigation against an affiliate of SuperValu. Swiss Re invokes an Indemnity Agreement that SuperValu entered into with the now-defunct Amwest Surety Insurance Company ("Amwest"). Swiss Re argues that it alternatively is subrogated to or was assigned Amwest's rights under the Indemnity Agreement. SuperValu counters that its indemnity obligations were never triggered, and, regardless, Swiss Re would not be entitled to recover under the Indemnity Agreement in Amwest's stead. Both parties crossmoved for summary judgment. (Doc. Nos. 26 and 32.) The Court concludes that SuperValu is in breach of the Indemnity Agreement and that Swiss Re may recover damages, but that Swiss Re is not entitled to attorneys' fees.

## I. FACTUAL BACKGROUND

### A. The Appeal Bond

On April 13, 1999, Connie Hemmings and Patty Lamphiear ("Plaintiff–Obligees") obtained a multi-million dollar jury verdict against Tidyman's Management Services ("Tidyman's") in the United

States District Court, Eastern District of Washington (Case No. CS097–0068–WFN). (Doc. No. 36, Decl. of Michael Gillies ("Gillies Decl."), ¶ 19, Ex. E.) On November 5, 1999, Amwest issued an appeal Bond in the amount of $5,160,000 (the "Bond") in favor of Plaintiffs, as Plaintiff–Obligees, and on behalf of Tidyman's, as Principal, thus allowing Tidyman's to obtain a stay on execution of the judgment and to proceed on appeal. (Gillies Decl. ¶ 7.)

**B.  The Reinsurance Agreement and the General Indemnity Agreement**

On November 8, 1999, Swiss Re entered into a Reinsurance Agreement (the "Reinsurance Agreement") in favor of the Plaintiff–Obligees, in the amount of $3,160,000, to secure and guaranty Amwest's performance of its appeal bond obligations. (Gillies Decl. ¶ 12.) Also on November 8, 1999, Tidyman, as Principal, entered into the Commercial Surety General Indemnity Agreement with Amwest, as Surety ("Tidyman's General Indemnity Agreement"). (Gillies Decl., Ex. F; Doc. No. 38, Decl. of Stephen A. Leys ("Leys Decl."), Ex. A). There, Tidyman's "agreed to indemnify Amwest and its reinsurers from all 'losses, costs, damages, attorneys' fees and expenses of whatever kind or nature' which arise by reason of, or as a consequence of, Amwest's execution of any bond." (*Id.*)

**C.  The Indemnity Agreement**

Thus, upon execution of the Bond, the Reinsurance Agreement, and the Tidyman's General Indemnity Agreement, the line-up was as follows: (1) Amwest was the direct writing company on the $5.16 million Bond; (2) Swiss Re was participating as the reinsurer taking on the obligation to pay up to $3.16 million if Amwest failed to pay any default by Tidyman's under the Bond, and agreeing that the Plaintiff–Obligees may sue Swiss Re for the amount of the reinsurance in case of default; and (3) Tidyman's, the appellant, was Amwest's

and Swiss Re's indemnitor for any losses arising out of any default relating to the Bond.

On November 29, 1999, SuperValu entered the picture. SuperValu was a co-member with Tidyman's of the organization called Tidyman's LLC and, as such, had a material interest in Tidyman's avoiding the multi-million verdict by successfully appealing the case. (*See* Gillies Decl. ¶¶ 8, 9, and 10.) As part of the inducement to Amwest's execution of the $5.16 million Bond, SuperValu executed a Commercial Surety Indemnity Agreement (the "SuperValu Indemnity Agreement"), pursuant to which it agreed that: "if a claim is made against [Amwest] relative to the Bond and [Tidyman's] fails to discharge the claim in full upon demand of [Amwest], then SuperValu shall pay [Amwest], the unpaid portion of such claim." (Gillies Decl., Ex. B at 1.)

The SuperValu Indemnity Agreement imposed a condition of indemnity: SuperValu was not obligated to make payments until Amwest had drawn the entire amount of a Letter of Credit in the amount of $2,460,000 dated November 26, 1999 by U.S. Bank in favor of Amwest. (*Id.*) It further provided that "the right afforded [Amwest] under this Agreement shall be in addition to, and not in lieu of, the right afforded [Amwest] under Principal's Indemnity [Tidyman's General Indemnity Agreement]." (*Id.* at 2.) The SuperValu Indemnity Agreement also stated that "[Amwest] shall have the right, in its reasonable judgment to determine whether any claim or suit upon the Bond on the basis of liability, expediency, or otherwise shall be paid, compromised, defended, or appealed." (*Id.*)

**C.  Amwest's Liquidation Proceedings and Settlement of Claims**

While the appeal was pending, Amwest became insolvent. On June 7, 2001, the

District Court of Lancaster County Nebraska, entered an Order of Liquidation, and Injunction, authorizing Amwest's Liquidation under Neb. Rev. Stat. § 44–4818. (Gillies Decl., Ex. D.) On February 20, 2003, the appeal process ended and Plaintiff's judgment became final; the amended judgment after appeal was in the amount of $5,902,586.82. (Gillies Decl., Ex. F.) On February 28, 2003, Plaintiffs filed their Proof of Claim in the Amwest Liquidation proceeding. (Gillies Decl. ¶ 15, Ex. F.) Also on February 28, 2003, Plaintiffs moved, under Rule 65.1 of the Federal Rules of Civil Procedure, to enforce the Bond against Amwest and Swiss Re. (Gillies Decl. ¶ 16, Ex. F.) That same day, Plaintiffs also moved for sanctions against Tidyman's and SuperValu. (Gillies Decl., Ex. F.)

While these motions were pending, Tidyman's, SuperValu, Amwest, and Plaintiffs decided to resolve their disputes by entering into a Settlement Agreement and Release (the "Settlement Agreement"). (Gillies Decl., ¶ 19, Ex. E.) Pursuant to the Settlement Agreement, a total of $6,100,000 was to be paid to Plaintiffs by April 17, 2003, and Plaintiffs agreed to withdraw and release all claims against the parties to the Settlement Agreement, including Tidyman's, Amwest, and Swiss Re. (*Id.*) Tidyman's, SuperValu, Amwest and Swiss Re separately entered into a side agreement (the "Reimbursement Agreement"). (Gillies Decl., ¶ 20, Ex. F.) Under the Reimbursement Agreement: (1) Swiss Re agreed to pay $1,656,294 to Plaintiff–Obligees; (2) Amwest agreed to draw upon the $2.46 million U.S. Bank Letter of Credit; (3) Tidyman's reaffirmed its indemnity obligations under the General Indemnity Agreement with Amwest; (4) Amwest assigned all of its rights under the SuperValu Indemnity Agreement to Swiss Re; (5) SuperValu acknowledged that Swiss Re reserved all of its rights in connection with the SuperValu Indemnity Agreement or otherwise; and (6) SuperValu reserved defenses relating to its obligations under the SuperValu Indemnity Agreement. (Gillies Decl., Ex. F.)

### D. Payment to Plaintiff–Obligees and Tidyman's Reimbursement of Swiss Re

Pursuant to the Settlement Agreement and the Reimbursement Agreement, Amwest drew on the Letter of Credit, and paid $2,460,000 to the Plaintiff–Obligees, and Swiss Re paid $1,656,294 to the Plaintiff–Obligees. (Gillies Decl., ¶¶ 21, 22.) Tidyman's then made the following payments to reimburse Swiss Re for its payment to the Plaintiff–Obligees: (1) $1,100,000 on May 4, 2004; (2) $308,806.37 on May 10, 2004; and (3) $140,870.10 on March 1, 2007. (*Id.* ¶ 25.) As a result of Tidyman's reimbursements, Swiss Re's $1,656,294 loss was offset by $1,549,676.47 in recoveries, leaving a net loss of $106,657.53. (*Id.*) In addition to this net loss, Swiss Re claims it incurred legal fees and expenses in investigating, evaluating, and handling the Obligee's claim and their motions, in the amount of $53,180.07. (Doc. No. 35, Decl. of Stephen A. Leys ("Leys Decl. II.") ¶ 5.)

### E. Swiss Re's Demand on SuperValu and the Current Lawsuit

On October 10, 2008, Swiss Re made demand on SuperValu to satisfy its indemnity obligations and remit payment to Swiss Re under the SuperValu Indemnity Agreement. (*Id.*) SuperValu refused and continues to deny that it is liable to Swiss Re. (*Id.* ¶ 7.) On November 4, 2009, Swiss filed the present action against SuperValu for (1) Breach of the SuperValu Indemnity Agreement; (2) Specific Performance of the SuperValu Indemnity Agreement; (3) and Declaratory Relief. (Doc. No. 1.) Swiss Re and SuperValu cross-moved for summary judgment on all claims.

## II. STANDARD OF REVIEW

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir.1996). As the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

Both parties have cross-moved for summary judgment and therefore agree that there are no disputed issues of material fact. Each party, however, offers competing interpretations of the rights granted and the obligations imposed by the various contracts at issue. Summary judgment is "especially appropriate in resolving disputes involving the interpretation of unambiguous contracts." *Hughes v. 3M Retiree Med. Plan*, 134 F.Supp.2d 1062, 1067 n. 12 (D.Minn.2001).

## III. DISCUSSION

At issue is whether Swiss Re is entitled to be reimbursed by SuperValu for its payments to the Plaintiff–Obligees and for its legal expenses. Swiss Re contends that it is entitled to recovery under the Indemnity Agreement that SuperValu entered into with Amwest. Swiss Re argues that it is subrogated to Amwest's rights against SuperValu under the SuperValu Indemnity Agreement pursuant to the doctrine of equitable subrogation or, in the alternative, Amwest's written assignment of its rights to Swiss Re.

SuperValu denies liability to Swiss Re on numerous grounds. First, SuperValu argues that Swiss Re cannot recover because, as a result of Amwest's insolvency, the Appeal Bond was cancelled, and SuperValu's indemnity obligations were never triggered because no claims were made "relative to the Bond", as set forth in the SuperValu Indemnity Agreement. Second, SuperValu contends that equitable subrogation is not appropriate because it was not contemplated by the SuperValu Indemnity Agreement. Third, SuperValu asserts that the SuperValu Indemnity Agreement barred any assignment by Amwest to Swiss Re of Amwest's rights thereunder. Fourth, SuperValu contends that Swiss Re's claims for indemnity are time-barred.[1] The Court addresses each argu-

---

1. SuperValu also argued, in a separate Sur–Reply brief, that Swiss Re's recovery from SuperValu is barred by a 2005 Settlement and Commutation Agreement between Amwest and Swiss Re. In response, Swiss Re argued that the Commutation Agreement did not resolve Swiss Re's subrogated and assigned claims against SuperValu. The Court agrees. First, the Settlement and Commutation Agreement provides that "this Agreement ... does not affect Swiss Re's or the Liquidator's existing rights, liabilities and obligations with respect to third parties nor does this Agreement confer any rights on any such parties." (Doc. No. 52, Decl. of Stephen A. Leys ("Leys Decl.

III"), Ex. A ¶ 8.) Further, the Commutation Agreement assigns to Swiss Re Amwest's rights under various contracts, including indemnification agreements. (*Id.* ¶ 9.) To the extent that Swiss Re received some offset from Amwest—and there is no evidence that it did—the Settlement and Commutation Agreement allows Swiss Re to pursue recovery and apportion any recovery pro-rata as between itself and Amwest, according to the losses that each incurred. (*Id.* ¶ 11.) In sum, the Court concludes that nothing in the Settlement and Commutation Agreement precludes

ment in turn, and further addresses Swiss Re's right to attorneys' fees.

## A. Whether a Claim was made "Relative To The Bond"

SuperValu argues that Amwest's liquidation and inability to fulfill its payment obligations to the Plaintiff–Obligees extinguished SuperValu's indemnity obligations under the SuperValu Indemnity Agreement.

SuperValu had agreed to act as Amwest's indemnitor relating to the Bond as follows:

> 2.1. Agreement of Indemnity. SuperValu agrees, subject to the terms and conditions of this Agreement, that if a claim is made against Surety [Amwest] *relative to the Bond* and Principal [Tidyman's] fails to discharge the claim in full upon demand of Surety, then *SuperValu shall pay Surety* the unpaid portion of such claim, subject to Sections 2.2, 2.3, and 2.4 of this Agreement.

(Gillies Decl., Ex. B at 1.). SuperValu contends that its indemnification obligations expired because no claim was made "relative to the Bond" before the Bond was cancelled in Amwest's liquidation. This Court disagrees.

According to SuperValu, the Indemnity Agreement "contained a very focused, narrow payment obligation to Amwest that arose if and only if, a claim against Amwest was made *relative* to the Appeal Bond." (Doc. No. 45, SuperValu's Rep. Mem. in Sup. of Sum. J. at 6.) (emphasis added). But SuperValu's proposed interpretation of "relative to the Bond" is reminiscent of Humpty Dumpty's assertion in Lewis Carroll's *Through the Looking Glass:* "[w]hen I use a word . . . it means just what I choose it to mean—neither more nor less." Lewis Carroll, THROUGH THE LOOKING GLASS, Ch. VI. Terms like

*relative* or *relate to,* "constitute[ ] the broadest language the parties could reasonably use." *Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.,* 118 F.3d 619, 621 (8th Cir.1997); *Kahler Corp. v. John Hancock Mut. Life Ins. Co.,* Civ. No. 4–88–1109, 1989 WL 119176, at *6 (D.Minn. Oct. 2, 1989) ("Clearly the term 'relates to' demands broad interpretation"). *Relative to* or *relate to* means "[t]o stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Storey Oil Co., Inc. v. Am. States Ins. Co.,* 622 N.E.2d 232, 235 (Ind.Ct.App.1993) (quoting Black's Law Dictionary 1288 (6th ed.1990)); *see also* Merriam–Webster's Collegiate Dictionary 1050 (11th ed.2007) (defining "relate to" to mean, inter alia, "to show or establish logical or causal connection between" and "to have relationship or connection"). In short, by choosing to indemnify Amwest for claims "relative to the Bond", SuperValu used the broadest conceivable language in its Indemnity Agreement.

Under the SuperValu Indemnity Agreement, Amwest had "the right, in its reasonable judgment, to determine whether any claim or suit upon the Bond on the basis of liability, expediency or otherwise shall be paid, compromised, defended, or appealed." (Gillies Decl., Ex. B at 2.) Here, the Plaintiff–Obligees made a claim relative to the Bond, which was defended, settled, and paid. Both Amwest and Swiss Re defended against the Obligee's various motions to collect payment on the Bond, and ultimately settled the claim. Swiss Re then fulfilled its payment Obligations under the Settlement Agreement.

█ It is of no moment whether Amwest was solvent when the Plaintiff–Obligees made their claim on the Bond. Amwest's solvency is not a condition

Swiss Re's indemnification claims against Su-    perValu.

precedent to SuperValu's obligations under the SuperValu Indemnity Agreement. Nor does the Indemnity Agreement provide that a claim must be made "relative to a solvent bond." Nothing in the language of SuperValu's Indemnity Agreement conditions SuperValu's indemnity obligations on Amwest's ability to maintain a solvent appeal bond. Unlike the bond in *State of Nebraska v. Amwest Surety Ins. Co.*, 274 Neb. 110, 738 N.W.2d 805 (2007), SuperValu's Indemnity Agreement had no conditions precedent other than the requirement that Amwest draw on the Letter of Credit, which Amwest fulfilled. While a party "may limit its liability by whatever conditions it may see fit to impose," SuperValu has not done so and cannot now avoid its obligations under the Indemnity Agreement. *Id.*

Moreover, the Bond was reinsured by Amwest to protect against the consequences of insolvency and, because of Swiss Re's reinsurance, the Bond did not fail. The Reinsurance Agreement plainly relates to the Bond, and any claims in connection thereto amount to claims "relative to the Bond" under the terms of the SuperValu Indemnity Agreement. Thus, consistent with the terms of the Indemnity Agreement, the Plaintiff–Obligees made a claim, Amwest drew on the Letter of Credit, and Swiss Re remitted payment thereon "relative to the Bond." In sum, Amwest's liquidation did not relieve SuperValu of its obligations under the SuperValu Indemnity Agreement.

It is also irrelevant whether the Plaintiff–Obligees filed a late "claim" in the Amwest liquidation proceeding. First, under the Indemnity Agreement, Amwest had discretion regarding how to handle claims in connection with the Bond. Second, after Amwest's liquidation, and in response to the litigation initiated by the Plaintiff–Obligees to enforce its rights under the Appeal Bond, the parties—including SuperValu, Amwest, Swiss Re, Tidyman's, and the Plaintiff–Obligees—entered into a Settlement Agreement. Regardless of whether the Plaintiff–Obligees' claim in the bankruptcy was timely, the parties ultimately agreed that the Plaintiff–Obligees should be paid under the Bond. Whether Plaintiff–Obligees filed a timely bankruptcy claim was not and need not be determined because Amwest chose to settle that claim and to draw on a Letter of Credit. In turn, Swiss Re, as Amwest's reinsurer, agreed to fulfill its reinsurance obligation, entered into a Settlement Agreement, and paid Plaintiff–Obligees' claim relative to the Bond. In sum, the Court concludes that there was a claim made relative to the Bond, which triggered SuperValu's indemnification obligations under the Indemnity Agreement.

## B. Whether the Application of Equitable Subrogation is Appropriate

■ Also unpersuasive is SuperValu's contention that Swiss Re is not subrogated to Amwest's rights because Amwest *itself* did not pay the Plaintiff–Obligees's claim relative to the Bond. At its core, SuperValu argues that any type of subrogation would be unfair because it was not contemplated by the Indemnity Agreement. This misses the point of equitable subrogation, which is an extra-contractual remedy. *See Citizens State Bank v. Raven Trading Partners, Inc.*, 786 N.W.2d 274, 279 (Minn. 2010) (stating that "conventional subrogation is contractual and is based on an agreement between parties ... [whereas] [e]quitable subrogation has its origin in common law and equity.") That Swiss Re is not a party to the Indemnity Agreement is irrelevant under the doctrine of equitable subrogation, which allows a performing guarantor who pays a debt of the principal/debtor to stand in the shoes of the principal/debtor and pursue its remedies

against third parties. *See Menorah Nursing Home, Inc. v. Zukov*, 153 A.D.2d 13, 17, 548 N.Y.S.2d 702 (N.Y.App.Div.1989); *see also Mon–Ray, Inc. v. Granite Re, Inc.*, 677 N.W.2d 434, 441 (Minn.Ct.App. 2004) ("[O]ne who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against the other"). Allowing Swiss Re to stand in the shoes of Amwest does not expand or alter SuperValu's liabilities beyond the SuperValu Indemnity Agreement.

SuperValu's position is further undercut by the express language of the SuperValu Indemnity Agreement, which provides: "The right afforded Surety under this Agreement shall be in addition to, and not in lieu of, the right afforded Surety under Principal's Indemnity." (Gillies Decl., Ex. B at 2.) The record indicates that, under the General Indemnity Agreement, Tidyman's, the principal, "agreed to indemnify Amwest and its *reinsurers* from all 'losses, costs, damages, attorneys' fees and expenses of whatever kind or nature' which arise by reason of, or a consequence of Amwest's execution of any bond." (Leys Decl., Ex. A.) (emphasis added). It appears then, that Tidyman's General Indemnity Agreement expressly granted to Swiss Re, as Amwest's reinsurer, a contractual benefit of indemnification. If so, the rights afforded Amwest by the General Indemnity Agreement with Tidyman's, including the rights of Amwest reinsurers to seek indemnification, carried over into Amwest's Indemnity Agreement.

■ At a minimum, Swiss Re's status as a third-party beneficiary under the General Indemnity Agreement further tips the scales of equity in favor of Swiss Re's recovery because it reinforces that the Indemnity Agreement did contemplate a reinsurer, such as Swiss Re, stepping into to Amwest's shoes and fulfilling its payment obligations. Notably, SuperValu's Indemnity Agreement was executed *after* Swiss Re already reinsured Amwest's Bond. *Cf. Swiss Reins. Am. Co. v. Airport Indus. Park, Inc.*, 2007 WL 2464504, at *3 n. 3 (W.D.Pa.2007) ("The [General Indemnity Agreement] [ ] was executed in 1995 and Swiss Re became a reinsurer some 3 1/2 years later. . . . [A]t the time the GIA was executed, the parties arguably did not reasonably contemplate that PEC might be responsible to a reinsurer in the event of Amwest's default"), *vacated and remanded*, 325 Fed.Appx. 59 (3rd Cir.2009). Thus, SuperValu cannot now contend that it did not contemplate that it might be liable to a reinsurer in the event of Amwest's default. In sum, the equities are in favor of Swiss Re's recovery.

**C. Whether Swiss Re Acquired Amwest's Right by Assignment**

■ As to Swiss Re's assignment-based subrogation rights, the Court cannot create an anti-assignment provision out of whole cloth. SuperValu contends that the SuperValu Indemnity Agreement is non-assignable because it was executed "for the benefit of Amwest" and provides that "This Agreement may not be changed or modified orally. No change or modification shall be effective unless specifically agreed to in writing." (Gillies Decl., Ex. B at 3.) Under Minnesota law, however, "in the absence of a contractual provision to the contrary, an obligor on a contract may assign all beneficial rights to another, or may delegate his or her duty to perform under the contract to another, without the consent of the oblige." *Vetter v. Sec. Cont. Ins. Co.*, 567 N.W.2d 516, 521 (Minn.1997). Thus, the default under Minnesota law is that contracts are freely assignable absent some language to the contrary.

The parties need not include "specific terms" or "magic words" to create an-anti

assignment provision, but SuperValu must now demonstrate that the Indemnity Agreement contains some language "manifesting the intention of the parties that it shall not be assigned." *Life Rehab Serv. Inc. v. Allied Prop. & Cas. Ins. Co.*, 616 F.Supp.2d 924, 934 (D.Minn.2007). SuperValu certainly could have included an express anti-assignment provision. *See, e.g., id.* (contract provided that "the rights and obligations of Berkey/Lennon shall not be assignable"); *Travertine Corp. v. Lexington–Silverwood*, 683 N.W.2d 267, 272 (Minn.2004) (same). Alternatively, SuperValu could have limited its liability with a "right of action" clause, providing that "no right of action shall accrue pursuant to the Indemnity Agreement relative to the bond to any person or entity other than the surety named herein (Amwest)", but it did not. *See, e.g., Tony and Leo, Inc. v. United States Fid. and Guar. Co.*, 281 N.W.2d 862, 864 (Minn.1979) (holding that subcontractor had no right of action on bond against surety where the bond expressly stated that "[n]o right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named herein (Peterson) or the heirs, executors, administrators or successors of Owner").

■ SuperValu's Indemnity Agreement set no limitations regarding SuperValu's indemnity obligation to parties other than Amwest and is silent regarding assignments. The SuperValu Indemnity Agreement's standard no-oral-modification clause is separate and distinct from an anti-assignment provision. And, the transfer or assignment of the SuperValu Indemnity Agreement from Amwest to Swiss Re does not modify or alter the Indemnity Agreement. As a sophisticated party to a commercial contract, SuperValu, unlike Humpty Dumpty, must say what it means in advance, not after the fact.

## D. The Statute of Limitations

SuperValu contends that Swiss Re's indemnity claims against SuperValu are barred by the applicable six-year statute of limitations. This Court disagrees.

■ Swiss Re's indemnity claim against SuperValu relating to any unpaid portion of the claim relative to the appeal bond became ripe for adjudication only after the Principal—Tidyman's—failed to make payment to Swiss Re, thus triggering SuperValu's indemnity obligations. Under the Indemnity Agreement, SuperValu's indemnity obligations arose only if and when Tidyman's failed to reimburse Swiss Re for its payment to the Plaintiff–Obligees in connection with the appeal bond. (Gillies Decl., Ex. B at 1.) Swiss Re could not sue SuperValu under the Indemnity Agreement based on a remote future possibility that Tidyman's would default on its payment to Swiss Re at some unknown time in the future. Tidyman's continued to comply with its payment obligations until June 7, 2007.[2] Thus, the statute of limitations began to run at the earliest, on June 7, 2007, when SuperValu's indemnity obligations came into effect. Alternatively, Swiss Re's claim became ripe on June 22, 2007—fifteen days after Swiss Re made a written demand on SuperValu, and SuperValu refused to reimburse Swiss Re for the unpaid portion of the claim based on Tidyman's default. Either way, Swiss Re's action is timely.

---

2. Swiss Re notes that before 2007, Tidyman failed to make a payment due on June 30, 2004. As Swiss Re correctly points out, Swiss Re's action would not be time-barred even if this Court were to determine that the statute of limitations began to run on June 30, 2004, because Swiss Re filed suit on November 4, 2009—well before the six-year limitations period had run.

## E. Whether SuperValu Breached the Indemnity Agreement

■ As set forth above, the Court concludes that Swiss Re acquired Amwest's rights under the SuperValu Indemnity Agreement by assignment or equitable subrogation. To establish a breach of the SuperValu Indemnity Agreement, Swiss Re must prove: (1) the formation of the Indemnity Agreement; (2) Swiss Re's performance of conditions precedent under the Indemnity Agreement; and (3) SuperValu's breach of the SuperValu Indemnity Agreement. *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay, & Polglaze, P.A.,* 756 N.W.2d 907, 918 (Minn.Ct.App.2008). The SuperValu Indemnity Agreement is plainly a binding contract. Further, all conditions precedent under the SuperValu Indemnity Agreement were satisfied. Amwest drew on the Letter of Credit, Swiss Re paid the Plaintiff–Obligees, and Tidyman's failed to discharge in full its indemnity obligations to Swiss Re. Finally, as guarantor, subrogee, and assignee of Amwest's right under the Indemnity Agreement, Swiss Re demanded payment from SuperValu. Under the SuperValu Indemnity Agreement, SuperValu must pay within 15 days of written demand. SuperValu refused and continues to refuse to remit payment to Swiss Re. SuperValu's failure to perform its indemnity obligations constitutes a breach of the SuperValu Indemnity Agreement, and Swiss Re suffered damages as a result.

## F. Swiss Re's Claim for Attorneys' Fees and Costs

The Court concludes that Swiss Re is not entitled to recover from SuperValu attorneys' fees and costs Swiss Re incurred in defending, settling, and administering payment of the claim relative to the Bond.

■ Generally, attorneys' fees are not recoverable unless there is specific contract language permitting recovery. *Citi-* zens State Bank of Big Lake v. Transamerica Ins. Co., 815 F.Supp. 309, 313 (D.Minn.1993) (citing *Barr/Nelson, Inc. v. Tonto's, Inc.,* 336 N.W.2d 46, 53 (Minn. 1983)). Here, there is no specific contract language allowing the recovery of attorneys' fees. Instead, the SuperValu Agreement simply states:

> [I]f a claim is made against [Amwest] relative to the Bond and [Tidyman's] fails to discharge the claim in full upon demand of [Amwest], then SuperValu shall pay (Amwest) the unpaid portion of such claim, subject to Sections 2.2, 2.3 and 2.4 of this Agreement.

(Gillies Decl., Ex. B at 1.) This language does not encompass indemnification for attorneys' fees and costs.

■ Even if the terms of the Indemnity Agreement are sufficiently comprehensive to support an award of attorney fees, under Minnesota law, a tender of defense is a condition precedent to the creation of an obligation to indemnify. *Seifert v. Regents of Univ. of Minn.,* 505 N.W.2d 83, 87 (Minn.Ct.App.1993) (citing *Jack Frost, Inc. v. Engineered Bldg. Components Co.,* 304 N.W.2d 346, 353 (Minn. 1981)). Swiss Re has not proffered any evidence to establish that it tendered its defense of the claim to SuperValu, and that SuperValu refused to defend. An indemnitee cannot recover attorneys' fees in defense of a claim absent its tendering the defense to the indemnitor and the indemnitor's refusal. *Sorenson v. Safety Flate, Inc.,* 306 Minn. 300, 235 N.W.2d 848, 852 (1975) (stating that tender of defense is required as a condition precedent to obtaining indemnification for attorneys' fees). Therefore, Swiss Re cannot now recover attorneys' fees and costs in connection with defending and administering the claim relative to the Bond.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff Swiss Reinsurance America Corporation's Motion for Summary Judgment (Doc. No. 32), is **GRANTED in part and DENIED in part**; and

2. Defendant SuperValu, Inc.'s Motion for Summary Judgment (Doc. No. 26), is **GRANTED in part and DENIED in part**;

**LET JUDGMENT BE ENTERED ACCORDINGLY.**